Charles CHADWICK, Petitioner,

v.

COLT ROSS OUTFITTERS, INC., a
Colorado Corporation, d/b/a Rocky
Mountain Outfitters, Respondent.

No. 03SC458.

Supreme Court of Colorado,
En Banc.

Nov. 8, 2004.

Michael E. McLachlan, Marla C. Underell, Durango, for Petitioner.

Casey & Seibert, LLC, James A. Casey, Durango, for Respondent.

Mark N. Williams, P.C., Mark N. Williams, Grand Junction, for Amicus Curiae Colorado Outfitters Association.

COATS, Justice.

Charles Chadwick, the plaintiff in the underlying personal injury action, sought review of the court of appeals unpublished opinion affirming summary judgment for the defendant, Colt Ross Outfitters. The district court found that an exculpatory agreement executed by Chadwick validly released Colt Ross from liability for the injuries Chadwick suffered during a hunting expedition, even if those injuries resulted from the Outfitter's negligence. The court of appeals affirmed, upholding the applicability and validity of the exculpatory agreement, after determining that it unambiguously expressed the intent of the parties and did not violate public policy. Because the agreement executed by Chadwick and Colt Ross Outfitters does unambiguously express the parties' intent to release Colt Ross from liability for Chadwick's injuries, and because it is not otherwise void as against public policy, the judgment of the court of appeals is affirmed.

I.

The suit arises from an incident that occurred during a hunting expedition, guided by Colt Ross Outfitters, Inc., in which Charles Chadwick was thrown from a mule and sustained severe injuries. Chadwick sued Colt Ross for negligently failing to supervise the hunt and, in particular, for failing to provide the proper equipment to secure his saddle. After unsuccessfully moving to dismiss, Colt Ross moved for summary judgment on the basis of a release provision included in the contract of the parties.

Chadwick, a resident of Texas, asserted in his pleadings that he contracted for and participated in an elk hunt organized by Colt Ross, a Colorado corporation engaged in the business of organizing, guiding, and supervising back-country hunting trips. Chadwick further asserted that several days after the hunt began, and well after he had complained that the horse assigned to him was ill, the wrangler removed the saddle from Chadwick's horse and placed it on one of the pack mules, instructing Chadwick to ride the mule for the rest of the trip. That same day, while Chadwick and a companion hunted without immediate supervision, the saddle began to slide down the mule's neck. When Chadwick attempted to dismount, the mule bucked, throwing him down a hill and causing serious injuries, including several fractures in his neck.

Colt Ross denied many of the allegations of the complaint but also asserted as a defense that Chadwick's claims were barred by the release agreement he signed before embarking on the hunt. In a motion for summary judgment, Colt Ross therefore asserted that the issues of fact disputed by the parties were not material to Chadwick's claims for relief. In granting the motion and dismissing the lawsuit, the district court found that the release agreement of the parties clearly and unambiguously expressed their intent to release the defendant from all claims for injury associated with the agreed-to hunting trip, and that Chadwick expressly acknowledged his understanding that he would be permitted to participate only if he agreed to this condition. The district court also rejected Chadwick's claim that in light of legislative regulation, public policy barred release of the Outfitter from liability for any but the inherent risks of equine activities and that, in any event, the agreement was inapplicable to injuries caused while Chadwick was riding a mule, rather than a horse.

The court of appeals affirmed. Relying on previous holdings of this court involving recreational activities, and particularly equine activities, the appellate court found that the release agreement was not void as against

public policy. It held that the language of the agreement reflected a clear and unambiguous intent to release the Outfitter from all liability for any injury resulting from Chadwick's participation in activities of the guided hunt; that the agreement contained the warnings expressly required by section 13–21–119, 5 C.R.S. (2003); and that riding a mule fell within the statutory definition of equine activities, as well as the broad language of the agreement concerning the use of animals while participating in the activities of the hunt.

Chadwick petitioned for a writ of certiorari.

## II.

■ In no event will an exculpatory agreement be permitted to shield against a claim of willful and wanton negligence. *Jones v. Dressel,* 623 P.2d 370, 376 (Colo. 1981). Although an exculpatory agreement that attempts to insulate a party from liability for his own simple negligence is also disfavored, it is not necessarily void as against the public policy of this jurisdiction, "as long as one party is not 'at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.'" *See Heil Valley Ranch v. Simkin,* 784 P.2d 781, 784 (Colo.1989) (citation omitted); *Jones,* 623 P.2d at 376. In determining the validity of such agreements, we have held that they must be closely scrutinized to ensure that the intent of the parties is expressed in clear and unambiguous language and that the circumstances and the nature of the service involved indicate that the contract was fairly entered into. *Id.*

■ To determine whether the intent of the parties is clearly and unambiguously expressed, we have previously examined the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions. *See Heil,* 784 P.2d at 785. We have even taken into account an injured party's subsequent acknowledgment that he understood the meaning of the provision. *See Heil,* 784 P.2d at 785; *cf. B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 138 (Colo.1998) (finding a release agreement valid where plaintiff admitted awareness that she was signing a release without reading it). Although the agreement must be clear, unambiguous, and unequivocal, we have also made clear that the specific terms "negligence" and "breach of warranty" are not invariably required for an exculpatory agreement to shield a party from claims based on negligence and breach of warranty. *Heil,* 784 P.2d at 785.

■ Even if the intent of the parties is unambiguously expressed in the contract, however, a release agreement may still violate public policy if it involves a service that the defendant is obligated to provide for the public or was entered into in an unfair manner. *Jones,* 623 P.2d at 376. Although we have not specified the precise circumstances in which a release agreement will be barred for affecting the public interest, we have noted that such agreements generally involve businesses suitable for public regulation; that are engaged in performing a public service of great importance, or even of practical necessity; that offer a service that is generally available to any members of the public who seek it; and that possess a decisive advantage of bargaining strength, enabling them to confront the public with a standardized adhesion contract of exculpation. *See id.* (quoting favorably from *Tunkl v. Regents of the Univ. of Cal.,* 60 Cal.2d 92, 32 Cal. Rptr. 33, 383 P.2d 441, 444–46 (1963)). From this class of businesses, however, we have previously distinguished businesses engaged in recreational activities, which are not practically necessary and with regard to which the provider owes no special duty to the public. *See, e.g., Jones,* 623 P.2d at 377; *Barker v. Colo. Region–Sports Car Club of Am., Inc.,* 35 Colo.App. 73, 79–80, 532 P.2d 372, 377 (1974).

In particular, we have previously considered recreational endeavors involving equine activities and have upheld broad exculpatory agreements in contracts related to such activities. *See, e.g., B & B Livery,* 960 P.2d 134; *Heil,* 784 P.2d 781. After our judgment in *Heil,* the General Assembly enacted section 13–21–119, limiting the civil liability of those involved in, among other things, equine

activities. *See B & B Livery,* 960 P.2d 134. Apart from imposing a general requirement to give notice of the inherent risks to be assumed by a participant, *see* § 13–21–119(5)(a)–(b),[1] the legislature has, however, done nothing to regulate equine activities or to impose additional duties on equine activity sponsors. Rather, the statute recognizes the inherent risks involved in equine activities and protects sponsors of equine activities by limiting their liability, except under specified circumstances. *See* § 13–21–119(4)(b). The statute itself imposes no liability on the sponsors for injuries beyond those for which liability is specifically limited, and this court has made clear that parties may, consistent with the statute, contract separately to release sponsors even from negligent conduct, as long as the intent of the parties is clearly expressed in the contract. *See B & B Livery,* 960 P.2d at 138.

### III.

■ The contract between Chadwick and Colt Ross was entitled, "Fully Guided Hunt Contract of Agreement." Its terms indicate that the sponsor agrees to provide the participant with a hunt, including a horse for each client, and that the participant agrees to assume the risk of "any activity associated with the type of trip agreed to." It contains a separately enumerated, emboldened section entitled, "Disclosures, Disclaimers and Waivers." Included among the enumerated risks and dangers of the "described sport or activity" is the "use of animals," accompanied by the warning that "[s]hould animals ever be used or are present as part of our activities, ... an animal ... may act or react unpredictably at times based upon instinct or fright which likewise is and [sic] inherent risk to be assumed by each participant." In addition to the statutorily required warning that the Outfitter will not be liable for injury or death resulting from "inherent risks" of equine activities, this section includes a separately enumerated clause indicating in capital, emboldened letters Chadwick's agreement to

"RELEASE FROM ANY LEGAL LIABILITY ... the Outfitter ... for any injury or death caused by or resulting from [his] participation in the activities described." The words, "THIS IS A RELEASE OF LIABILITY," appear in capital, emboldened letters just above Chadwick's signature.

The organization of the contract and the placement of this release language make it unrealistic that these provisions could be missed or misunderstood by the reader. The release provision is not inordinately long. It is uncomplicated and free from legal jargon. Separate from, and in sharp contrast to, the statutorily required notice of the inherent risks assumed by Chadwick upon participating in equine activities generally, the release agreement specifies that "[a]s [l]awful [c]onsideration for" being permitted to participate in the guided hunt, Chadwick also releases the Outfitter from "any legal liability." While this agreement, like the agreement in *Heil,* never uses the word "negligence," the language in which it expresses itself cannot reasonably be understood as expressing anything other than an intent to release from "any" liability for injuries "caused by or resulting from" Chadwick's "participation" in the contracted-for hunting expedition.

In fact, the release agreement in this case is so unambiguously broad that, on its face, it includes a release from even willful and wanton negligence. Enforcing a release from willful negligence would clearly not be consistent with public policy; however, rather than rendering the entire agreement void, similarly broad language has, in the past, been construed to extend only as far as would be consistent with public policy. *See B & B Livery,* 960 P.2d at 138–39 (reading language that protected the defendant "from any liability in the event of any injury or damage of any nature" as shielding against negligence claims but remanding for further proceedings concerning the plaintiff's willful and wanton/gross negligence claims); *Barker,* 35 Colo.App. at 82–83, 532 P.2d at 378–79 (en-

---

1. Subsections (5)(a) and (b) require the following warning notice:

**WARNING**

Under Colorado Law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to section 13–21–119, Colorado Revised Statutes.

forcing an exculpatory agreement to prevent recovery for injuries caused by the simple negligence of two defendants, but permitting a claim for another defendant's willful and wanton negligence to stand); *see also Murphy v. N. Am. River Runners, Inc.*, 186 W.Va. 310, 412 S.E.2d 504, 511 (1991) (declaring that an exculpatory clause releasing the defendant "from all liability for any future loss" applies only to simple negligence and will not be construed to release the defendant from injury resulting from intentional or reckless misconduct).

Nor can the contract reasonably be understood—as Chadwick intended, according to his deposition—to make the release provisions effective only upon satisfactory fulfillment by the Outfitter of its contractual obligations. Nothing in the contract suggests that the release agreement is in any way contingent. To the contrary, the contract spells out the client's available remedies for breach by the Outfitter, which are limited to return of a pro rata portion of his fee. Furthermore, such an interpretation would provide the Outfitter with virtually no protection and would render the release essentially meaningless. It therefore could not be considered a reasonable interpretation. *See Heil*, 784 P.2d at 785.

The applicability of the release agreement is therefore limited to the question whether Chadwick was injured while participating in the activities described in the contract. Whether or not a failure to properly supervise or to provide Chadwick a riding horse on the day in question could amount to a breach by the Outfitter under these circumstances, neither eventuality could alter the fact that Chadwick was injured while participating in the guided hunt that was the subject of the contract, or activities associated with it. The very basis of Chadwick's lawsuit is that he was injured while using equipment and riding an animal provided by Colt Ross, in the wilderness, on a hunting expedition organized, supervised, and guided by Colt Ross and its employee. Chadwick's express assumption of the risk of "any activity associated with the type of trip agreed to" can hardly be understood to be inapplicable for the reason that he was hunting on a mule at the time of his injuries.

■ Although perhaps too broad on its face, the release in this case unambiguously contemplated release from at least the simple negligence of the Outfitter, and as applied to Chadwick's allegations of negligence, the contract was therefore not necessarily void as against public policy.[2] Furthermore, apart from falling within the statutory immunity provisions governing equine activities,[3] riding a mule during the guided hunt provided by Colt Ross was clearly an activity "associated with the type of trip agreed to," with regard to which Chadwick assumed all risks of injury.

Finally, the contract does not fail for other policy reasons. There was no indication that the contract was unfairly entered into. It was delivered to Chadwick in Texas and was signed by him in his home more than ten months before the trip. There is no suggestion that Chadwick is not competent and educated; his initials appear in the blank spaces after each clause of the "Disclosures, Disclaimers and Waivers" section of the contract; and he admitted in his deposition that he read the contract and understood that he was executing a release of liability when he signed it. Moreover, the Outfitter had no duty to the public that would be violated by the release agreement. Like the skydiving company in *Jones*, Colt Ross provides a recreational service, neither publicly regulated nor of great public importance, and therefore the contract between Chadwick and Colt Ross "does not fall within the category of agreements affecting the public interest." *Jones*, 623 P.2d at 377.

## IV.

Because the contract executed by Chadwick and Colt Ross Outfitters clearly and

---

2. Although language in the complaint could be interpreted to separately allege willful and wanton negligence, Chadwick has not challenged the court of appeals judgment, affirming dismissal of the entire lawsuit, on this ground.

3. " 'Equine' means a horse, pony, mule, donkey, or hinny." § 13–21–119(2)(b).

unambiguously expresses the intent of the parties to release Colt Ross from all liability for injuries resulting from the contracted-for hunt, and does not otherwise violate public policy, we affirm the judgment of the court of appeals.

Justice HOBBS dissents.

Justice KOURLIS does not participate.

Justice HOBBS dissenting:

I respectfully dissent. The majority holds that the agreement Chadwick signed for an outfitted, horseback elk hunt released Colt Ross from any liability for the severe injuries caused him. In reaching this result, the majority finds that the liability release provisions of the agreement unambiguously exculpate Colt Ross from all acts of negligence it committed in the course of causing Chadwick's injuries.

I disagree. Properly construed in light of the applicable law, the release language, in my view, did not validly put Chadwick on notice that he was waiving the statutory duty of care the Colorado General Assembly placed on Colt Ross to supply proper tack for the mule the outfitter provided Chadwick when his horse became sick. The contract and release did not clearly and adequately specify that it applied to any animal other than a horse, which had been guaranteed to Chadwick by the contract for the duration of the trip.

Section 13–21–119 immunizes an outfitter from liability for injuries resulting from the inherent risks of equine activities, see section 13–21–119(3), C.R.S. (2004), but excludes from this immunity certain types of negligent behavior of an equine professional. See § 13–21–119(4). Specifically, supplying faulty riding equipment is not immunized; outfitters are required to use tack designed for the animal assigned the rider. See § 13–21–119(4)(b)(I)(A). Here, the release language did not sufficiently notify Chadwick that he was releasing liability for negligence relating to the failure to provide the proper tack for riding any animal other than a horse.

The facts of this case are particularly egregious. Chadwick, a Texas resident, contracted for an outfitted, horseback elk hunt into the Colorado wilderness. According to Chadwick's allegations, when Chadwick's assigned horse became sick during the course of the journey, those responsible for his safety required him to ride a pack mule improperly equipped with a horse saddle. The horse saddle did not contain either a breast collar or a croupier, which are required for safely riding a mule. Not designed for a mule, the horse saddle was slipping off the animal when Chadwick attempted to dismount and was thrown, sustaining great injury that included multiple neck fractures. A mule saddle had been available, but a Colt Ross employee continued to use it rather than offering it to Chadwick.

In choosing to jeopardize the safety of its client, Colt Ross violated both the specific terms of its agreement with Chadwick and section 13–21–119(4)(b)(I)(A) it's duty to provide an animal properly equipped for riding. Instead of making its client whole, Colt Ross claims Chadwick should have known the release he was signing excused it from supplying a properly equipped mule for riding.

We have recognized that a written agreement can release an outfitter of the obligation to comply with a duty of care, but such release must clearly and unambiguously put the client on notice that he or she is surrendering the right to hold the outfitter to that duty. *B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 138 (Colo.1998); *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 784 (Colo.1990); *Jones v. Dressel,* 623 P.2d 370, 378 (Colo.1981).

Agreements that attempt to insulate a party from liability from negligence are disfavored and must be closely scrutinized. *See Heil Valley Ranch,* 784 P.2d at 783; *Jones,* 623 P.2d at 376. We construe an exculpatory agreement strictly against the drafter. *See Heil Valley Ranch,* 784 P.2d at 784. Our inquiry is contract-specific and focuses on "whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil Valley Ranch,* 784 P.2d at 785.

In determining whether an exculpatory release is valid, we consider four factors: (1) the existence of a duty to the public; (2) the

nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language. *B & B Livery,* 960 P.2d at 136. As in *B & B Livery,* the fourth factor is at issue here. We must determine whether the parties' intent was to extinguish liability for Colt Ross's acts of negligence, and whether this intent was clearly and unambiguously expressed.

Three portions of the contract at issue here release Colt Ross of liability. The first two portions state:

1.   The described sport or activity and all other hazards and exposures connected with the activities conducted in the outdoors do involve risk and that I am cognizant of the *risks and dangers inherent* with camping and in particular in the mountains of Colorado, and that I and/or my family, including any minor children, are fully capable of participating in the activities contracted for and willingly assume the risk of injury as my responsibility, including loss of control or balance in walking or climbing, use of firearms, use of animals, weather, collisions with trees, rocks and other man-made or natural obstacles, whether they are obvious or not obvious.

2.   Any route or activity, chosen as part of the Trip in which I and/or my family am participating may not be the safest but has or will be chosen for its interest, challenge or best meeting the goals of the services for which I am contracting. Should animals ever be used or are present as part of our activities, I and my family understand that an animal irrespective of its training and usual past behavior and characteristics, may act or react unpredictably at times based upon instinct or fright which likewise is an *inherent risk* to be assumed by each participant in the activity. WARNING—Under Colorado Law, an equine professional is not liable for an injury to or the death of a participant in equine activities resulting from the inherent risks of equine activities, pursuant to section 13–21–119, Colorado Revised Statutes. (emphasis added).

These two sections are directed at the inherent risks involved in equine activities, risks which were clearly noticed in the contract and which Chadwick accepted.   However, these two sections do not address the possibility of Colt Ross breaching its duty of care in the course of outfitting and guiding the hunting trip; rather, the third section addresses this topic:

AS LAWFUL CONSIDERATION for being permitted by Outfitter to participate in the referenced activities, I do hereby RELEASE FROM ANY LEGAL LIABILITY, AGREE NOT TO SUE, CLAIM AGAINST, ATTACH THE PROPERTY OF OR PROSECUTE, AND FURTHER AGREE TO DEFEND, INDEMNIFY AND HOLD HARMLESS the Outfitter, the owner of leased private lands, the United States Forest Service or Parks Department, the BLM, any governmental agency whose property any activity scheduled may be required to utilize, and all of their officers, members, organizations, agents and employees for any injury or death caused by or resulting from my *participation in the activities described above.* Also to allow all use of photos, etc. for the use of advertisement, brochures, shows, etc. (emphasis added).

This section effectuates a general release of liability, but limits itself to injury or death caused by or resulting from "participation in the activities described above."   The Contract of Agreement, set forth before the release language, specifically describes the contracted "activity" as including the duty of Colt Ross to provide "Riding horses for each client for the duration of the trip."   Colt Ross breached this provision of the contract part of the way into the trip by assigning Chadwick a mule to ride.

The contract's "Disclosures, Disclaimers and Waivers" provisions do not provide any notice that Chadwick might be required to ride an animal other than a horse or that such an animal might not be outfitted properly with appropriate riding equipment.   To the contrary, the plain, logical, and common sense reading of the general release is that Chadwick foregoes any and all claims for injury related to riding a horse on the trip.

472

Although Colt Ross argues that the release provisions cover all "animals," this term appears only in the first two provisions of the release, which pertain to the client's cognizance of the "risks and dangers *inherent* with ... the use of animals." The general release paragraph, on the other hand, refers back to the general contract wherein the activities are described as specifically including the riding of a horse.

As in *Heil Valley Ranch*, the contract here clearly states that the essential service the outfitter must provide is an outfitted hunt by horseback for the duration of the trip; the contract also clearly states that the associated risk Chadwick accepts, and for which he waives liability, is any risk related to that service.

However, the risk to which Colt Ross exposed Chadwick by placing him on an incorrectly equipped mule is not clearly and unambiguously expressed in the release, and Chadwick did not waive that risk. Discharging our duty to construe the exculpatory provisions of the contract against their drafter and in favor of the injured client should lead this court to allow Chadwick's negligence action in this case.

Section 13–21–119 is a carefully-crafted combination of protections for both an outfitter and for participants in outdoor activities, recognizing that recreation is an important economic activity for the State of Colorado, its citizens, and visitors. *See People v. Schafer,* 946 P.2d 938, 944 (Colo.1997). Under contract principles, visitors and citizens of Colorado, with adequate disclosure, may consciously contract away statutory and common law duties of care—but not willful and wanton or gross negligence—and may expose themselves to recreational risks without violating public policy. The release in this case, however, failed to disclose to Chadwick that he might be riding an animal other than a horse and that he would be waiving the outfitter's duty of care to properly equip that animal for riding.

I conclude that Colt Ross is not immunized from Chadwick's claim for damages in this case, either by the statute or the contract he signed. Accordingly, Colorado courts should hear his suit, and I respectfully dissent.