**Chelsea E. HAMILL, Plaintiff–Appellant,**

**v.**

**CHELEY COLORADO CAMPS, INC., a Colorado corporation, Defendant–Appellee.**

**No. 10CA0138.**

Colorado Court of Appeals,
Div. II.

March 31, 2011.

§ 24–51–1105, C.R.S.2010.

Roberts, Levin, Rosenberg, PC, Ross B.H. Buchanan, Bradley A. Levin, Denver, Colorado, for Plaintiff–Appellant.

White and Steele, P.C., John M. Lesback, John P. Craver, Denver, Colorado, for Defendant–Appellee.

Opinion by Judge FOX.

Plaintiff, Chelsea E. Hamill (Hamill), appeals the district court's grant of summary judgment in favor of defendant, Cheley Colorado Camps, Inc. (Cheley). We affirm the judgment.

### I. Facts and Procedural History

Hamill attended summer camp at Cheley in 2002, 2003, and 2004. Before attending camp each summer, Hamill and her parents signed a Liability/Risk Form (the agreement).

In July 2004, when Hamill was fifteen years old, she fell off a Cheley horse and

broke her arm. Hamill sued Cheley for negligence and gross negligence, arguing that a Cheley wrangler had inappropriately saddled the horse she rode. The district court granted Cheley's motion for summary judgment on the two negligence claims, ruling that although Hamill was a minor, the agreement barred her claims and that there was no gross negligence as a matter of law.[1]

Hamill appeals the district court's judgment, claiming that because she was a minor and her mother did not make an informed decision, the agreement did not extinguish her negligence claims and that disputed material facts preclude the grant of summary judgment on her gross negligence claim. We disagree and therefore affirm the judgment.

## II. Standard of Review

Summary judgment is appropriate where the pleadings, admissions, depositions, answers to interrogatories, and affidavits confirm that no genuine issue of material fact exists and judgment should be entered as a matter of law. C.R.C.P. 56(c); *Jones v. Dressel,* 623 P.2d 370, 373 (Colo.1981). When asked to grant summary judgment, the district court "must resolve all doubts as to whether an issue of fact exists against the moving party." *Jones,* 623 P.2d at 373. We review a summary judgment ruling de novo. *Aspen Wilderness Workshop, Inc. v. Colorado Water Conservation Bd.,* 901 P.2d 1251, 1256 (Colo.1995).

Exculpatory agreements are construed strictly against the party seeking to limit its liability. *Heil Valley Ranch, Inc. v. Simkin,* 784 P.2d 781, 784 (Colo.1989). However, the validity of such waivers is a question of law, which we review de novo. *Jones,* 623 P.2d at 376; *Stanley v. Creighton Co.,* 911 P.2d 705, 707 (Colo.App.1996).

## III. Parental Consent to Exculpatory Agreements Affecting Minors

Hamill argues that the exculpatory clauses in the agreement do not bar her negligence claims. She reasons that the agreement is invalid under the four-part test articulated in *Jones,* 623 P.2d at 376, and that her mother did not make an informed decision under section 13–22–107, C.R.S.2010, to release her prospective negligence claims. This statute states that "[s]o long as [a parent's] decision [to waive the child's claims] is voluntary and *informed,* the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education." § 13–22–107(1)(a)(V), C.R.S.2010 (emphasis added).

We disagree with Hamill's position.

The agreement, and our interpretation of section 13–22–107(1)(a)(V), direct our decision.

The release language in the agreement states:

Release, Waiver of Liability and Indemnification

I, on behalf of myself and my child, hereby release and waive *any claim of liability against Cheley* ... with respect to any injury ... occurring to my child while he/she participates in any and all camp programs and activities.

I hereby agree to indemnify and hold harmless Cheley ... with respect to any claim asserted by or on behalf of my child as a result of injury....

I HAVE READ AND UNDERSTAND THE ABOVE AND AGREE TO BE BOUND BY THE TERMS OF THIS DOCUMENT.

(Emphasis by italics added.)

Another section of the agreement, labeled "Acknowledgment & Assumption of Risks and Waiver of Claims for Minors," states:

PLEASE READ CAREFULLY BEFORE SIGNING. THIS DOCUMENT INCLUDES A RELEASE OF LIABILITY AND WAIVER OF CERTAIN LEGAL RIGHTS.

. . . .

Acknowledgment of Risks

---

1. In addition, the district court determined that whether a saddle can slip due to negligence, or because of animal behavior, presented issues of fact under section 13–21–119, C.R.S.2010, the equine immunity act. Because of its ruling on the agreement, however, the court also ruled that the equine act claim need not be submitted to a jury.

I understand there are numerous risks associated with participation in any camping activities, *including ... horseback riding.... Many, but not all of these risks are inherent* in these and other activities....

Equipment used in the activity may break, fail or malfunction, despite reasonable maintenance and use. Some of the equipment used in activities may inflict injuries even when used as intended. Persons using equipment may lose control of such equipment and cause injury to themselves and to others.

. . . .

Counselors and guides use their best judgment in determining how to react to circumstances including ... animal character.... The counselors and guides may misjudge such circumstances, an individual's capabilities and the like.

. . . .

These are some, *but not all,* of the risks inherent in camping activities; a complete listing of *inherent and other risks* is not possible. There are also risks which cannot be anticipated.

I give my permission for my child to participate in all camp activities, including those described above. I acknowledge and assume the risks involved in these activities, and for any damages, illness, *injury or death* ... resulting from such risks for myself and my child.

(Emphasis by italics added.)

Before deciding whether the agreement adequately "informed" Hamill's mother under section 13–22–107 regarding prospective negligence claims, we first address the validity of the agreement.

### A. Validity of an Exculpatory Agreement Under *Jones*

■ We analyze the validity of an exculpatory agreement, including those involving a minor child, by examining four factors: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language.

*B & B Livery, Inc. v. Riehl,* 960 P.2d 134, 136 (Colo.1998) (citing *Jones,* 623 P.2d at 376).

### 1. First and Second *Jones* Factors: Duty and Nature of the Services

■ The first *Jones* factor requires that we determine whether a duty to the public existed in the instant case. *Jones,* 623 P.2d at 376. Our supreme court has held that businesses engaged in recreational activities that are not practically necessary, such as equine activities, do not perform services implicating a public duty. *Chadwick v. Colt Ross Outfitters, Inc.,* 100 P.3d 465, 469 (Colo. 2004).

The second *Jones* factor examines the nature of the service performed. *Jones,* 623 P.2d at 376. Here, Cheley provided recreational camping services, including horseback riding. The services were "not a matter of practical necessity for even some members of the public," because horseback riding is not "an essential service." *Jones,* 623 P.2d at 377–78; *see also Chadwick,* 100 P.3d at 467; *Day v. Snowmass Stables, Inc.,* 810 F.Supp. 289, 294 (D.Colo.1993) (recreational equine services offered by the stable were not essential); *cf. Stanley,* 911 P.2d 705 (residential lease was matter of public interest, and exculpatory clause was void). The General Assembly's enactment of section 13–21–119, C.R.S.2010, limiting the civil liability of those involved in equine activities, underscores the fact that horseback riding is a matter of choice rather than necessity. *Chadwick,* 100 P.3d at 467–68.

### 2. Third *Jones* Factor: Fairness

■ A contract is fairly entered into if one party is not so obviously disadvantaged with respect to bargaining power that the resulting contract essentially places him at the mercy of the other party's negligence. *Heil Valley Ranch, Inc.,* 784 P.2d at 784; *accord Mincin v. Vail Holdings, Inc.,* 308 F.3d 1105, 1111 (10th Cir.2002) (the second and third prongs of *Jones* inquire into the respective bargaining power of each party created by the "practical necessity" of the activity). Because horseback riding is not an essential activity, Hamill's mother was not

"at the mercy" of Cheley's negligence when signing the agreement. *See Chadwick,* 100 P.3d at 469; *see also Mincin,* 308 F.3d at 1111 (because mountain biking was not an essential activity, no inferior bargaining power was identified); *Day,* 810 F.Supp. at 294 (defendants did not enjoy an unfair bargaining advantage in offering equine services).

By her own admission, Hamill's mother voluntarily chose to sign the agreement expressly giving permission for Hamill to participate in horseback riding activities. *Cf. Wycoff v. Grace Community Church,* 251 P.3d 1260, 1265 (Colo.App.2010) (a waiver was insufficient to allow parents to assess the degree of risk involved and extent of possible injuries because it did not describe the activity that resulted in injury).

■ In assessing fairness, courts may also examine whether the services provided could have been obtained elsewhere. *See Jones,* 623 P.2d at 375 (that a contract is offered on a "take-it-or-leave-it" basis does not, by itself, cause it to be an adhesion contract). The availability of other camps and other providers of horseback riding excursions is highlighted by Hamill's mother's deposition testimony that Hamill previously attended other camps. The record supports the district court's conclusion that the agreement was entered into fairly.

### 3. Fourth *Jones* Factor: Intention of the Parties

■ Next, Hamill contends that the parties' intention was not clearly stated in the agreement. Her claim that she only intended to release claims for "things that Cheley would have no control over" does not create a fact issue and is contradicted by the record.

■ In reviewing a contract, we must enforce the plain meaning of the contract terms. *USI Properties East, Inc. v. Simpson,* 938 P.2d 168, 172 (Colo.1997); *B & B Livery, Inc.,* 960 P.2d at 136. We must also determine whether its terms are ambiguous, that is, susceptible of more than one reasonable interpretation. *B & B Livery, Inc.,* 960 P.2d at 136. The parties' disagreement over the meaning does not in and of itself create an ambiguity in the contract.

*Kuta v. Joint Dist. No. 50(J),* 799 P.2d 379, 382 (Colo.1990).

The language of the agreement here is unambiguous, and we give effect to its plain meaning. *USI Properties East, Inc.,* 938 P.2d at 172; *Kuta,* 799 P.2d at 382 (courts establish the meaning of a contract by examining the entire instrument as a whole, and not by viewing clauses or phrases in isolation).

Decisions of our supreme court also guide our examination of whether exculpatory agreements clearly evidence the parties' intention. The Colorado Supreme Court enforced exculpatory agreements in *B & B Livery, Inc.* and *Chadwick,* which were similar to the agreement here, concluding that they clearly expressed the parties' intent.

In *B & B Livery, Inc.,* 960 P.2d 134, the plaintiff sued B & B to recover for injuries sustained when she fell from a rented horse. The plaintiff signed an exculpatory agreement containing the equine act's mandatory release language warning that an equine professional is not liable for injury or death resulting from inherent risks of equine activities. *See* § 13–21–119(5)(b), C.R.S.2010. The release also contained broad exculpatory language, releasing the company from "any liability in the event of any injury or damage of any nature (or perhaps even death) to [her] or anyone else caused by [her] electing to mount and then ride a horse owned or operated by B & B Livery, Inc." *B & B Livery, Inc.,* 960 P.2d at 135.

The plaintiff argued that the inclusion of this broad language created an ambiguity. *Id.* The supreme court disagreed, ruling that the agreement was written in simple and clear terms, it was not inordinately long, and the plaintiff admitted that she "really didn't read" the release before she signed it, but was aware she was signing a release. *Id.* at 138 n. 5. The supreme court held, based on the language of the agreement, "while we cannot be certain that if … [the plaintiff] had read and studied the agreement she would have signed it, there can be no dispute she intended to grant a general release to B & B." *Id.* at 138.

In *Chadwick*, 100 P.3d 465, a participant in a back-country hunting trip sued the organizers of the trip when he was thrown off a mule and injured. Along with the equine act's release language, the release also contained a "RELEASE FROM ANY LEGAL LIABILITY ... for any injury or death caused by or resulting from [his] participation in the activities." 100 P.3d at 468. In upholding the exculpatory agreement, the supreme court held that, while the agreement did not specifically include the word "negligence," it nonetheless barred the plaintiff's negligence claims. *Id.* The court reasoned that the release (1) was not inordinately long; (2) did not contain legal jargon; and (3) included the statutory release for inherent risks, but also included language releasing the defendant from "any legal liability." *Id.* Therefore, the supreme court held the exculpatory language "cannot reasonably be understood as expressing anything other than an intent to release from 'any' liability for injuries 'caused by or resulting from'" the plaintiff's participation in the activity. *Id.*

In accordance with the public policy stated in section 13–21–119(4)(b), C.R.S.2010, the supreme court held that parties may contract to release activity sponsors "even from negligent conduct, as long as the intent of the parties is clearly expressed in the contract." *Id.; see B & B Livery, Inc.*, 960 P.2d at 138.

As in *Chadwick* and *B & B Livery, Inc.*, the agreement here is not inordinately long—three and a half pages. The legal jargon is minimal. Along with the statutory release language of section 13–21–119(5)(b), the agreement identifies many risks associated with camping activities, including horseback riding. The agreement, like that in *Chadwick*, broadly states an intent to release claims of liability for "any injury," and like that in *B & B Livery, Inc.*, it includes all degrees of potential injury, including the "death" of the participant. Hamill and both of her parents signed the agreement on April 27, 2004. Indeed, they also signed agreements containing the same language each of the two previous years.

The agreement covers "inherent and *other risks*," noting that "[m]any, *but not all, of these risks are inherent*," and stating that it is impossible to delineate a full list of risks, inherent or otherwise. Finally, the agreement repeatedly states that, by signing, Hamill's mother agreed to release prospective claims against Cheley for "*any legal liability*," "*any injury*," and "*any claim*." (Emphasis added by italics.) The agreement sufficiently placed Hamill's mother on notice that the "[e]quipment used ... may break, fail or malfunction" and that "counselors ... may misjudge ... circumstances." The breadth of the release persuades us that the parties intended to disclaim legal liability for negligence claims. Indeed, misjudging a situation can amount to negligence. *See Heil Valley Ranch, Inc.*, 784 P.2d at 781–82 (valid exculpatory agreement need not invariably contain the word "negligence").

To hold, as Hamill now argues, that the release did not provide greater protection than the release from liability of inherent risks provided by the equine act, section 13–21–119, would render large portions of the agreement meaningless. *Heil Valley Ranch, Inc.*, 784 P.2d at 785 (it is unreasonable to interpret an exculpatory agreement for an equine provider in such a way as to provide virtually no protection for the provider and render the release essentially meaningless); *Chadwick*, 100 P.3d at 469 (interpreting release provisions to be contingent upon satisfactory fulfillment by the provider of contractual obligations would render the release essentially meaningless). An agreement with such plain and unambiguous terms will not fail because one of the parties, in hindsight, now claims to have misunderstood the scope of that agreement—to govern only conduct outside of Cheley's control—based on ambiguities not readily apparent within the four corners of the agreement.

Because the agreement did not implicate a public duty, did not involve an essential service, was fairly entered into, and it plainly expressed the intent to release prospective negligence claims, we hold that the agreement is valid.

### B.  Informed Consent Under Section 13–22–107

We next examine Hamill's claim that her mother's consent to release prospective negli-

gence claims was not "informed," as required by section 13–22–107, because she did not understand the scope of the agreement.

In 2002, the Colorado Supreme Court held that it was against public policy for parents to prospectively waive liability on behalf of minor children. *Cooper v. Aspen Skiing Co.,* 48 P.3d 1229 (Colo.2002). The following year, the General Assembly superseded *Cooper* by enacting section 13–22–107(3), C.R.S. 2010, which allows parents to "release or waive the child's prospective claim for negligence." The statute declares "that parents have a fundamental right to make decisions on behalf of their children, including deciding whether the children should participate in risky activities." *Wycoff,* 251 P.3d at 1264; *see* § 13–22–107(1)(a)(I)–(V). The statute states that "[s]o long as the [parent's] decision is voluntary and *informed,* the decision should be given the same dignity as decisions regarding schooling, medical treatment, and religious education." § 13–22–107(1)(a)(V) (emphasis added). However, the statute does not allow a parent to waive a child's prospective claim for "willful and wanton, ... reckless, ... [or] grossly negligent" acts or omissions. § 13–22–107(4), C.R.S.2010; *Wycoff,* 251 P.3d at 1264.

Relying on the "informed" language of the statute, Hamill asserts that Cheley's failure to identify the possibility that she might fall from a horse in the manner she did invalidates her mother's consent.

▆ We assume that the General Assembly was aware of the *Jones* test when it enacted section 13–22–107(1)(a)(V), *Vaughan v. McMinn,* 945 P.2d 404, 408 (Colo.1997), but required something *more* for the waiver of a minor's prospective negligence claims. *Wycoff,* 251 P.3d at —— (concluding that the statutory requirement to "inform" parents under section 13–22–107(1)(a)(V), requires something *more* than meeting the *Jones* factors). The General Assembly required that the consent to waiver by a parent be "voluntary and informed." *Wycoff,* 251 P.3d at ——; *Vigil v. Franklin,* 103 P.3d 322, 327

(Colo.2004); *Boles v. Sun Ergoline, Inc.,* 223 P.3d 724, 725 (Colo.2010) (noting that the supreme court invalidated an exculpatory agreement without regard to the *Jones* factors in *Cooper,* 48 P.3d at 1236).[2] A parent's decision is informed when the parent has sufficient information to assess the potential degree of risks involved, and the extent of possible injury. *Wycoff,* 251 P.3d at ——; *see also Black's Law Dictionary* 346 (9th ed. 2009) (defining "informed consent" as "agreement to allow something to happen, made with full knowledge of the risks involved and the alternatives").

In *Wycoff,* a minor was injured while being pulled behind an ATV on an inner tube over a frozen lake. The mother did not know her child would engage in the activity. The exculpatory agreement the mother signed in advance made no reference to the activity. *Wycoff,* 251 P.3d at ——. Thus, the mother was unable to assess the risks, or the degree of possible injury, before signing the release. *Id.* Accordingly, a majority of the division in *Wycoff* found that release legally insufficient to bar the daughter's personal injury claims. *Id.* The instant case is unlike *Wycoff.*

### 1. Degree of Risk

▆ In contrast to *Wycoff,* the undisputed facts in the record show that Hamill's mother knew the activities Cheley offered. Hamill had attended Cheley and ridden the camp horses for two years before the accident. The agreement clearly indicated that horseback riding was an activity available to campers. The agreement described many of the risks associated with horseback riding at camp, and notified Hamill's mother that it was impossible to list all risks. *See, e.g., Mallett v. Pirkey,* 171 Colo. 271, 285, 466 P.2d 466, 473 (1970) (recognizing that while it is impossible for a physician to advise a patient of all conceivable risks, disclosure of substantial medical risks associated with surgical decision yields valid informed consent).

The agreement included language that informed Hamill's mother that the equipment

---

**2.** In *Boles,* our supreme court addressed the effectiveness of exculpatory agreements with regard to strict products liability. The supreme court cited *Cooper* for the proposition that the court may invalidate such agreements based on public policy considerations, without regard to the *Jones* test. However, we do not read *Boles* as invalidating the *Jones* test.

used by Cheley could fail and that the wranglers might "misjudge" situations. Both of these possibilities envision forms of negligence. As discussed above, the agreement itself directly contradicts Hamill's mother's objectively unreasonable interpretation of the contract that prospective negligence claims were not waived. See Crum v. April Corp., 62 P.3d 1039, 1041 (Colo.App.2002) (contracts generally will be interpreted to impose objectively reasonable standards, unless the contract involves matters of fancy or taste).

Hamill's mother testified at her deposition that she voluntarily signed the release after having "skimmed" it. She had signed the same agreement in 2002 and 2003 and agreed that, by signing the waiver, she understood that she was accepting certain risks of injury to her child. See Rasmussen v. Freehling, 159 Colo. 414, 417, 412 P.2d 217, 219 (1966) (if a person signs a contract without reading it, she is barred from claiming she is not bound by what it says); Day, 810 F.Supp. at 294 (a party signing a contract without reading it cannot deny knowledge of its contents, and is bound by what it says). She never contacted Cheley to discuss the release form, and had no questions about the language of the release form when she signed it. Hamill's mother further agreed that "when you sign a document, you understand you're agreeing to the terms in that document." See B & B Livery, Inc., 960 P.2d at 141 (plaintiff admitted she had signed other releases in the past and was familiar with the fact that some activities required releases). Hamill's mother admitted that the first time she had read through the agreement "thoroughly" was in her attorney's office on June 2, 2009, well after the accident. Hamill's mother's signature communicated to Cheley that she had read and understood the terms of the contract and agreed to be bound by them.

That Hamill's mother may not have contemplated the precise mechanics of her daughter's fall does not invalidate the release and does not create a genuine issue of material fact. She knew her daughter would be riding horses and she was advised that there were risks, known and unknown, associated with the activity. Indeed, Hamill's mother acknowledged in her deposition testimony that when horseback riding, there is "a risk of a child being thrown or falling off a horse." Hamill's argument that her mother did not give informed consent, despite her signature on the agreement and the language in the agreement indicating the contrary, is not persuasive and does not create a genuine issue of material fact. As a matter of law, the agreement sufficiently informed Hamill's mother about the risks involved in horseback riding.

### 2. Extent of Injury

The broad release language in the agreement waiving "any claims of liability," for "any injury," even "death," evidences that Hamill's mother was informed that she was waving Hamill's prospective claims, including negligence, and had sufficient information to assess the extent of possible injuries to Hamill. At her deposition, Hamill's mother testified as follows:

Attorney: And, you know, you knew that someone such as Christopher Reeve had been tragically injured falling off a horse?

Ms. Hamill: Yes.

Attorney: Did you personally know Mr. Reeve?

Ms. Hamill: Yes.

Attorney: And so you were aware that there were significant risks associated with horseback riding?

Ms. Hamill: Yes.

Attorney: And you were aware that your daughter was going to be doing a significant amount of horseback riding?

Ms. Hamill: Yes.

The agreement did not need to include an exhaustive list of particularized injury scenarios to be effective.

Our review of the entire record leads us to conclude that there are no genuine issues of material fact. Hamill's mother had more than sufficient information to allow her to assess the extent of injury possible in horseback riding, and to make an "informed" decision before signing the release. See Black's Law Dictionary 346 (definition of informed consent).

We conclude that the agreement adequately disclosed the extent of potential injuries. Moreover, because the agreement was fairly entered into and the language clearly and unambiguously presents no genuine issue of material fact as to whether Hamill's mother was informed of the agreement's intent to release "all claims," including prospective negligence claims, the district court did not err in granting summary judgment for Cheley.

### IV. Public Policy

■ Hamill next argues that public policy considerations render the agreement invalid. According to Hamill, the General Assembly's post-*Cooper* enactment of section 13–22–107 is in derogation of the common law, and, as such, the agreement must be strictly construed against Cheley. While we construe the agreement against Cheley because it is the party seeking to limit its liability, *Heil Valley Ranch*, 784 P.2d at 784, we cannot invalidate the agreement for public policy reasons.

■ The General Assembly is the branch of government charged with implementing public policies. *Crawford Rehabilitation Services, Inc. v. Weissman*, 938 P.2d 540, 553 (Colo.1997). The judiciary's role is to recognize and enforce such implementation. *Id.* By enacting section 13–22–107(1)(b), the General Assembly expressly superseded *Cooper*, 48 P.3d 1229, and empowered parents to weigh the risks and benefits of their children's activities. Appellate courts have a fundamental responsibility to "interpret statutes in a way that gives effect to the General Assembly's intent in enacting that particular statute." *Carlson v. Ferris*, 85 P.3d 504, 508 (Colo.2003); *accord People v. Luther*, 58 P.3d 1013, 1015 (Colo.2002). The General Assembly has the authority to abrogate the common law, as it did in enacting section 13–22–107(1)(b), which directly superseded *Cooper*, 48 P.3d 1229. *See Vaughan*, 945 P.2d at 408 (if the legislature wishes to abrogate rights otherwise available under the common law, it must manifest its intent either expressly or by clear implication).

The governing statute promotes children's involvement in horseback riding and approves the informed release of prospective negligence claims. Thus, Hamill's public policy argument is unavailing.

### V. Gross Negligence

Finally, Hamill contends genuine issues of material fact exist regarding her gross negligence claim. We disagree.

■ Both parties concede that exculpatory agreements are not a bar to civil liability for gross negligence. *Jones*, 623 P.2d at 376; *Forman v. Brown*, 944 P.2d 559, 564 (Colo.App.1996). Gross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others. *Forman*, 944 P.2d at 564. Whether a defendant's conduct is purposeful or reckless is ordinarily a question of fact; however, "if the record is devoid of sufficient evidence to raise a factual issue, then the question may be resolved by the court as a matter of law." *Id.*

■ The record shows that a Cheley wrangler checked Hamill's saddle two to three times before the ride. Hamill's deposition testimony indicates that a wrangler assisted in saddling her horse. Consistent with Cheley's standard procedure, the wrangler checked the saddle again before giving the camper permission to mount the horse. Hamill testified at deposition that once she was mounted, a Cheley wrangler asked her to dismount so the wrangler could, again, adjust the saddle and stirrups. Thus, the uncontradicted deposition testimony is that the saddle was properly cinched when the ride started and that the wranglers exercised care in making sure it was done appropriately. A Cheley wrangler on foot then led the riders on a path toward a riding ring while another wrangler followed. The wrangler leading the group stopped to check for traffic before allowing the campers and their horses to walk across the road to the ring. Hamill rode approximately 100 yards from where her saddle was last checked before she fell off the horse.

While Hamill asserts that the shape of the horse and its claimed propensity to bloat its

stomach made saddle slippage more likely, she did not demonstrate that, before her accident, simply tightening the girth would not address the issue. There is no evidence that Cheley's wrangler was "willfully" incompetent, purposefully caused the saddle to slip, or recklessly disregarded the appropriate way to tack the horse. Hamill's mother testified that she thought "Cheley has the utmost care in what they do, but mistakes happen." Under these circumstances, we perceive no genuine issue of material fact. Hence, the district court was correct in dismissing the gross negligence claim on summary judgment.[3]

The judgment is affirmed.

Judge CASEBOLT and Judge LOEB concur.

---

**3.** Because we find that the agreement barred Hamill's negligence claims, we do not need to address, as the district court did, whether saddle slippage is an inherent risk of horseback riding that implicates the equine act.