Opinion by JUDGE MILLER
¶ 1 In this action seeking recovery for personal injuries sustained at a fitness club, plaintiff, Wendy Jane Stone, appeals the summary judgment entered in favor of defendants, Life Time Fitness, Inc.; Life Time Fitness Foundation; and LTF Club Operations Company, Inc. (collectively, Life Time), on Stone's negligence and Premises Liability Act (PLA) claims based on injuries sustained when she tripped on a hair dryer cord after washing her hands. The principal issue presented on appeal is whether the district court correctly ruled that Stone's claims are contractually barred based on assumption of risk and liability release language contained in a member usage agreement (Agreement) she signed when she became a member of Life Time.
¶ 2 We disagree with the district court's conclusion that the exculpatory provisions of the Agreement are valid as applied to Stone's PLA claim. Consequently, we reverse the judgment as to that claim and remand the case for further proceedings. We affirm the district court's judgment on the negligence claim.
I. Background
¶ 3 Stone was a member of a Life Time fitness club located in Centennial. According to the complaint, she sustained injuries in the women's locker room after finishing a workout. Stone alleged that she had washed her hands at a locker room sink and then "turned to leave when she tripped on the blow dryer cord that was, unbeknownst to her, hanging to the floor beneath the sink and vanity counter top." She caught her foot in the cord and fell to the ground, fracturing her right ankle.
¶ 4 Stone alleged that allowing the blow dryer cord to hang below the sink counter constituted a trip hazard and a dangerous condition and that, by allowing the condition to exist, Life Time failed to exercise reasonable care. She asserted a general negligence claim and also a claim under Colorado's PLA, section 13-21-115, C.R.S. 2016.
¶ 5 Life Time moved for summary judgment, relying on assumption of risk and liability release language contained in the Agreement Stone signed when she joined Life Time. Life Time argued that the Agreement was valid and enforceable, that it expressly covered the type and circumstances of her injuries, and that it barred Stone's claims as a matter of law. A copy of the Agreement appears in the Appendix to this opinion.
¶ 6 After full briefing, the district court granted Life Time's motion, concluding that the Agreement was "valid and enforceable" and that Stone had released Life Time from all the claims asserted in the complaint.
*228 II. Discussion
¶ 7 Stone contends that the Agreement's exculpatory language does not validly apply to her claims. She contends that the district court, therefore, erred in entering summary judgment and dismissing her action.
A. Summary Judgment Standards
¶ 8 Summary judgment is appropriate if the pleadings and supporting documents establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Gagne v. Gagne , 2014 COA 127, ¶ 24, 338 P.3d 1152 ; see C.R.C.P. 56(c). We review de novo an order granting a motion for summary judgment. Gagne , ¶ 24 ; see Ranch O, LLC v. Colo. Cattlemen's Agric. Land Tr. , 2015 COA 20, ¶ 12, 361 P.3d 1063.
B. Negligence Claim
¶ 9 In her complaint, Stone alleged common law negligence and PLA claims, and she pursues both claims on appeal. The trial court's summary judgment ruled in favor of Life Time without distinguishing between Stone's negligence and PLA claims. It simply concluded that the exculpatory clauses in the Agreement were "valid and enforceable" and released Life Time from all claims asserted against it.
¶ 10 We turn to the negligence claim first because we may affirm a correct judgment for reasons different from those relied on by the trial court. English v. Griffith , 99 P.3d 90, 92 (Colo. App. 2004).
¶ 11 The parties agree that the PLA applies to this case. In section 13-21-115(2), the statute provides:
In any civil action brought against a landowner by a person who alleges injury occurring while on the real property of another and by reason of the condition of such property, or activities conducted or circumstances existing on such property, the landowner shall be liable only as provided in subsection (3) of this section.
The PLA thus provides the sole remedy against landowners[1] for injuries on their property. Vigil v. Franklin , 103 P.3d 322, 328-29 (Colo. 2004) ; Wycoff v. Grace Cmty. Church of Assemblies of God , 251 P.3d 1260, 1265 (Colo. App. 2010). Similarly, it is well established that the PLA abrogates common law negligence claims against landowners. Legro v. Robinson , 2012 COA 182, ¶ 20, 328 P.3d 238, aff'd , 2014 CO 40, 325 P.3d 1053.
¶ 12 Accordingly, albeit for reasons different from those expressed by the trial court, we conclude that Stone could not bring a claim for common law negligence, and the trial court therefore correctly ruled against her on that claim. We now turn to the effect of the exculpatory clauses in the Agreement on Stone's PLA claim.
C. Application of Exculpatory Clauses to PLA Claim
¶ 13 As we understand Stone's contentions, she does not dispute that the exculpatory language in the Agreement would preclude her from asserting claims under the PLA for any injuries she might sustain when working out on a treadmill, stationary bicycle, or other exercise equipment or playing racquetball. We therefore do not address such claims. Instead, Stone argues that the exculpatory clauses do not clearly and unambiguously apply to her injuries incurred after washing her hands in the women's locker room. We agree.
1. Law
¶ 14 "Generally, exculpatory agreements have long been disfavored." B & B Livery, Inc. v. Riehl , 960 P.2d 134, 136 (Colo. 1998). Determining the sufficiency and validity of an exculpatory agreement is a question of law for the court. Id. ; Jones v. Dressel , 623 P.2d 370, 375 (Colo. 1981). This analysis requires close scrutiny of the agreement to ensure that the intent of the parties is expressed in clear, unambiguous, and unequivocal language.
*229 Chadwick v. Colt Ross Outfitters, Inc. , 100 P.3d 465, 467 (Colo. 2004). Our supreme court has explained:
To determine whether the intent of the parties is clearly and unambiguously expressed, we have previously examined the actual language of the agreement for legal jargon, length and complication, and any likelihood of confusion or failure of a party to recognize the full extent of the release provisions.
Id.
¶ 15 Under Jones , a court must consider four factors in determining whether an exculpatory agreement is valid: (1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties was expressed in clear and unambiguous language. 623 P.2d at 375.
2. Analysis
a. The First Three Jones Factors
¶ 16 The first three Jones factors provide little help for Stone's position. The supreme court has specified that no public duty is implicated if a business provides recreational services. See Chadwick , 100 P.3d at 467 (addressing guided hunting services and noting that providers of recreational activities owe "no special duty to the public"); Jones , 623 P.2d at 376-78 (skydiving services); see also Hamill v. Cheley Colorado Camps, Inc. , 262 P.3d 945, 949 (Colo. App. 2011) (addressing recreational camping services and noting supreme court authority).
¶ 17 With regard to the second factor, the nature of the services provided, courts have consistently deemed recreational services to be neither essential nor a matter of practical necessity. See Chadwick , 100 P.3d at 467 ; Hamill , 262 P.3d at 949 ; see also Brooks v. Timberline Tours, Inc. , 941 F.Supp. 959, 962 (D. Colo. 1996) (snowmobiling not a matter of practical necessity), aff'd , 127 F.3d 1273 (10th Cir. 1997) ; Lahey v. Covington , 964 F.Supp. 1440, 1445 (D. Colo. 1996) (whitewater rafting not an essential service), aff'd sub nom. Lahey v. Twin Lakes Expeditions, Inc. , 113 F.3d 1246 (10th Cir. 1997). Stone attempts to distinguish those cases by asserting that people join fitness centers "to promote their health, not for the thrill of a dangerous recreational activity." She cites no authority for such a distinction, and we are not persuaded that such activities as camping and horseback riding, at issue in the cases cited above, are engaged in for a dangerous thrill as opposed to the healthful benefits of outdoor exercise. Consequently, the recreational nature of the services Life Time provides does not weigh against upholding or enforcing the Agreement.
¶ 18 With respect to the third factor, a contract is fairly entered into if one party is not at such an obvious disadvantage in bargaining power that the effect of the contract is to place that party at the mercy of the other party's negligence. See Hamill , 262 P.3d at 949 ; see also Heil Valley Ranch, Inc. v. Simkin , 784 P.2d 781, 784 (Colo. 1989). Possible examples of unfair disparity in bargaining power include agreements between employers and employees and between common carriers or public utilities and members of the public. See Heil Valley Ranch, Inc. , 784 P.2d at 784. However, this type of unfair disparity is generally not implicated when a person contracts with a business providing recreational services. See id. ; see also Hamill , 262 P.3d at 949-50.
¶ 19 In evaluating fairness, courts also examine whether the services provided could have been obtained elsewhere. Hamill , 262 P.3d at 950. Nothing in the record indicates that Stone could not have taken her business elsewhere and joined a different fitness club or recreation center. Nor is there any other evidence that the parties' relative bargaining strengths were unfairly disparate so as to weigh against enforcing the Agreement.
¶ 20 We therefore turn to the fourth prong of the Jones test-whether the intention of the parties was expressed in clear and unambiguous language.
b. The Fourth Jones Factor
¶ 21 The validity of exculpatory clauses releasing or waiving future negligence claims usually turns on the fourth Jones factor-whether the intention of the *230 parties is expressed in clear and unambiguous language. Wycoff , 251 P.3d at 1263 (applying the Jones factors to a PLA claim). This case also turns on that factor.
¶ 22 The issue is not whether a detailed textual analysis would lead a court to determine that the language, even if ambiguous, ultimately would bar the plaintiff's claims. Instead, the language must be clear and unambiguous and also "unequivocal" to be enforceable. Chadwick , 100 P.3d at 467 ; see also Threadgill v. Peabody Coal Co. , 34 Colo.App. 203, 209, 526 P.2d 676, 679 (1974), cited with approval in Jones , 623 P.2d at 378.
¶ 23 We conclude that the Agreement fails this test for numerous reasons.
¶ 24 First , as explained by the New York Court of Appeals, "a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon." Gross v. Sweet , 49 N.Y.2d 102, 424 N.Y.S.2d 365, 400 N.E.2d 306, 309 (1979), cited with approval in Jones , 623 P.2d at 378. Here, the Agreement consists of extremely dense fine print, for which a great many people would require a magnifying glass or magnifying reading glasses.
¶ 25 Second , the two clauses are replete with legal jargon, using phrases and terms such as "affiliates, subsidiaries, successors, or assigns"; "assumption of risk"; "inherent risk of injury"; "includes, but is not limited to"; and "I agree to defend, indemnify and hold Life Time Fitness harmless." The use of such technical legal language militates against the conclusion that the release of liability was clear and simple to a lay person.
¶ 26 Third , the first of the two clauses relied on by Life Time bears the following heading: "under Chapter 458, 459, 460, or Chapter 461 ASSUMPTION OF RISK." At oral argument, counsel for Life Time conceded that the reference to multiple chapters was ambiguous and confusing, and he could not explain to what the chapters referred. Our research has not enlightened us on the subject. Conscientious lay persons could reasonably have skipped over the fine print appearing under that heading, believing it did not apply to them because they would have no reason to understand that chapters 458, 459, 460, or 461 had any relevance to their situation. Thus, the assumption of risk heading was not clear and unambiguous.
¶ 27 Fourth , the dominant focus of the Agreement is on the risks of strenuous exercise and use of exercise equipment at the fitness center:
• The opening paragraph of the Agreement contains the following warning: "All members are strongly encouraged to have a complete physical examination by a medical doctor prior to beginning any work out program or strenuous new activity. If I have a history of heart disease, I agree to consult a physician before becoming a Life Time Fitness member."
• Under the confusing assumption of risk heading, the first sentence states, "I understand that there is an inherent risk of injury, whether caused by me or someone else, in the use of or presence at a Life Time Fitness Center, the use of equipment and services at a Life Time Fitness Center, and participation in Life Time Fitness' programs."
• There then follows a listing of types of risks, including the use of "indoor and outdoor pool areas with waterslides, a climbing wall area, ball and racquet courts, cardiovascular and resistance training equipment," and other specified programs, as well as "[i]njuries arising from the use of Life Time Fitness' centers or equipment" and from activities and programs sponsored by Life Time; "[i]njuries or medical disorders resulting from exercise at a Life Time Fitness center, including, but not limited to heart attacks, strokes, heart stress, spr [sic] broken bones and torn muscles or ligaments"; and "[i]njuries resulting from the actions taken or decisions made regarding medical or survival procedures."
¶ 28 Fifth , the term "inherent risk of injury" that appears in the assumption of risk clause has been applied in various Colorado statutes and case law to address waivers of *231 liability only for activities that are dangerous or potentially dangerous. Thus, the General Assembly has provided for releases from liability in circumstances such as activities involving horses and llamas, section 13-21-119, C.R.S. 2016; being a spectator at baseball games, section 13-21-120, C.R.S. 2016; agricultural recreation or agritourism activities (including hunting, shooting, diving, and operating a motorized recreational vehicle on or near agricultural land), section 13-21-121, C.R.S. 2016; skiing, section 33-44-109, C.R.S. 2016; and spaceflight activities, section 41-6-101, C.R.S. 2016. Significantly, not one of these statutory exemptions from liability extends to the use of locker rooms, rest rooms, or dressing rooms associated with these activities. Rather, the releases of liability extend only to the dangerous or potentially dangerous activities themselves.
¶ 29 Colorado's published cases concerning the term "inherent risks" similarly concern dangerous or potentially dangerous activities. For example, the term "inherent risks" has been addressed in cases involving skiing, Graven v. Vail Assocs., Inc. , 909 P.2d 514, 519 (Colo. 1995) ; horseback riding, Heil Valley Ranch, Inc. , 784 P.2d at 782 ; medical procedures or surgical techniques, Mudd v. Dorr , 40 Colo.App. 74, 78-79, 574 P.2d 97, 101 (1977) ; and attendance at roller hockey games, Teneyck v. Roller Hockey Colo., Ltd. , 10 P.3d 707, 710 (Colo. App. 2000). Thus, in reported cases, the term "inherent risks" has been limited to dangerous or potentially dangerous activities, rather than accidents occurring in more common situations, such as using locker rooms.
¶ 30 In light of this statutory and case law backdrop, the use of the inherent risk language in the assumption of risk clause, and the Agreement's focus on the use of exercise equipment and facilities and physical injuries resulting from strenuous exercise, one could reasonably conclude that by signing the Agreement he or she was waiving claims based only on the inherent risks of injury related to fitness activities, as opposed to washing one's hands. Indeed, Stone so stated in her affidavit submitted in opposition to the motion for summary judgment.
¶ 31 Sixth , Life Time contends that the only relevant language we need consider is that set forth in the second exculpatory clause, labeled "RELEASE OF LIABILITY." That provision begins by stating that "I waive any and all claims or actions that may arise against Life Time ... as a result of any such injury." (Emphasis added.) The quoted language, however, is the first use of the term "injury" in the release of liability clause. So the scope of the release can be determined only by referring back to the confusing assumption of risk clause. It is not surprising then that Life Time's counsel characterized the release's reference to "such injury" as "squirrely." In any event, all of the ambiguities and confusion in the assumption of risk clause necessarily infect the release clause.
¶ 32 Seventh , the exculpatory clauses repeatedly use the phrases "includes, but is not limited to" and "including and without limitation," as well as simply "including." The repeated use of these phrases makes the clauses more confusing, and the reader is left to guess whether the phrases have different meanings. The problem is compounded by conflicting views expressed by divisions of this court on whether the similar phrase "including, but not limited to" is expansive or restrictive. Compare Maehal Enters., Inc. v. Thunder Mountain Custom Cycles, Inc. , 313 P.3d 584, 590 (Colo. App. 2011) (declining to treat the phrase as restrictive and citing Bryan A. Garner, A Dictionary of Modern Legal Usage 432 (2d ed. 1995)), with Ridgeview Classical Sch. v. Poudre Sch. Dist. , 214 P.3d 476, 483 (Colo. App. 2008) (declining to conclude that the phrase took the statute out of the limiting rule of ejusdem generis ). For purposes of deciding this case we need not resolve this conflict; the relevance of the conflict for present purposes is that it creates another ambiguity.
¶ 33 That ambiguity-expansive versus restrictive-is critical because nothing in the Agreement refers to risks of using sinks or locker rooms. The assumption of risk clause refers to the "risk of loss, theft or damage of personal property" for the member or her guests while "using any lockers" at a Life Time fitness center. That is quite a separate *232 matter, however, from suffering a physical injury in a locker room.
¶ 34 Significantly, when Life Time intends to exclude accidental injuries occurring in locker rooms, it knows how to draft a clear waiver of liability doing so. In Geczi v. Lifetime Fitness , 973 N.E.2d 801, 803 (Ohio Ct. App. 2012), the plaintiff entered into a membership agreement with Life Time in 2000 (eleven years before Stone entered into the Agreement), which provided in relevant part:
[T]he undersigned agrees to specifically assume all risk of injury while using any of the Clubs['] facilities, equipment, services or programs and hereby waives any and all claims or actions which may arise against LIFE TIME FITNESS or its owners and employees as a result of such injury. The risks include, but are not limited to
....
(4) Accidental injuries within the facilities, including, but not limited to the locker rooms, ... showers and dressing rooms.
Id. at 806. Life Time chose not to include similar language in the Agreement signed by Stone.
c. The Agreement Is not Clear, Unambiguous, and Unequivocal
¶ 35 Based on the foregoing discussion, and after scrutinizing the exculpatory clauses, we conclude that the Agreement uses excessive legal jargon, is unnecessarily complex, and creates a likelihood of confusion or failure of a party to recognize the full extent of the release provisions. See Chadwick , 100 P.3d at 467. Accordingly, the Agreement does not clearly, unambiguously, and unequivocally bar Stone's PLA claim based on the injuries she alleges she sustained after she washed her hands in the women's locker room.
III. Conclusion
¶ 36 The judgment on Stone's negligence claim is affirmed, the judgment on her PLA claim is reversed, and the case is remanded for further proceedings on that claim.
JUDGE TAUBMAN and JUDGE FOX concur.
Appendix *233 --------

Section 13-21-115(1), C.R.S. 2016, defines "landowner" as including "a person in possession of real property and a person legally responsible for the condition of real property or for the activities conducted or circumstances existing on real property." In its answer, Life Time admitted that it owned and operated the club where Stone was injured and that the PLA governs her claims.