**MAEHAL ENTERPRISES, INC., d/b/a Pikes Peak Harley–Davidson, a Colorado corporation, Plaintiff–Appellee and Cross–Appellant**

v.

**THUNDER MOUNTAIN CUSTOM CYCLES, INC., a Colorado corporation, Defendant–Appellant and Cross–Appellee.**

No. 09CA0806.

Colorado Court of Appeals,
Div. III.

July 7, 2011.

Garth J. Nicholls, P.C., Garth J. Nicholls, Colorado Springs, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Hanes Hrbacek & Bartels, LLC, Patrick Hrbacek, Colorado Springs, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge LICHTENSTEIN.

This case arises from the parties' agreement allowing plaintiff, Maehal Enterprises, Inc., doing business as Pikes Peak Harley–Davidson (PPHD), to act as a dealer of motorcycles manufactured by defendant, Thunder Mountain Custom Cycles, Inc. (TMCC). After the State Department of Revenue Auto Industry Division informed PPHD that it was not authorized to sell TMCC's motorcycles, PPHD brought suit, and the case ultimately proceeded to a bench trial.

TMCC appeals and PPHD cross-appeals various aspects of the trial court's judgment on PPHD's claims of (1) violation of statutes regulating automobile dealers, *see* §§ 12–6–101 to –128, C.R.S.2010, (2) breach of contract, and (3) negligent misrepresentation.[1]

We reverse the trial court's judgment on the claims for statutory violations and breach of contract, and remand for further proceedings on those claims, including findings on PPHD's claim for reimbursement of its parts costs. We affirm the trial court's judgment in all other respects.

---

1. In particular, TMCC contends that the trial court erroneously (1) allowed PPHD to amend its complaint after the close of evidence (2) found that it breached the parties' contract; (3) found PPHD suffered damages as a result of the breach; (4) allowed PPHD to recover as damages the full purchase price of the unsold TMCC motorcycles; (5) awarded PPHD costs and attorneys fees; (6) failed to find that PPHD did not mitigate its damages; and (7) failed to find that the judgment against TMCC be deemed satisfied.

On cross-appeal, PPHD contends the trial court erred in ruling that neither TMCC nor Todd Erdmann, TMCC's owner, violated section 12–6–120, C.R.S.2010, which lists unlawful acts of manufacturers.

## I. Background

PPHD is a motor vehicle dealer licensed in Colorado. TMCC is a licensed manufacturer of motor vehicles in Colorado, and between 2001 and November 2007, it was also a licensed motor vehicle dealer in Colorado.

In December 2005, PPHD approached TMCC to discuss the possibility of PPHD becoming a dealer of TMCC's motorcycles. The parties reached an agreement (sales contract), and on or about December 15, 2005, TMCC delivered seven motorcycles, together with bills of sale, to PPHD with the understanding that the Manufacturer's Statements of Origin (MSOs) would be provided to PPHD upon full payment. According to the trial court's finding of fact, the parties agreed that PPHD could immediately display and resell the motorcycles.

The parties executed a written dealer contract on January 18, 2006 (dealer contract). The contract provided that PPHD would act as a dealer of TMCC's motorcycles from January 18, 2006, until January 18, 2007, and that the contract would "be renewed on an annual basis only on the joint concurrence of [PPHD] and TMCC." The contract specified that TMCC "was under no obligation to renew [it] at any time."

In May 2006, PPHD paid in full for the motorcycles through the proceeds of a financing "floor plan," and TMCC sent PPHD the MSOs. PPHD sold one of the motorcycles a couple of months later, and provided the purchaser with a bill of sale and an MSO.

The parties' dealer contract expired by its own terms on January 18, 2007.

In February 2007, the Auto Industry Division reviewed TMCC's manufacturer license renewal application and noticed that TMCC was licensed as both a manufacturer and a dealer, in violation of section 12–6–120.5(1), C.R.S.2010, the independent control of dealer provision. Section 12–6–120.5(1) provides that "[e]xcept as otherwise provided in this section, no manufacturer shall own, operate, or control any motor vehicle dealer or used motor vehicle dealer in Colorado."

One way that the Division enforces compliance with that statute is to refuse to issue titles to any motorcycle sold by a manufacturer that violates that provision. Thus, the Division informed PPHD and TMCC that, as a result of TMCC's statutory violation, PPHD was no longer authorized to sell TMCC's motorcycles. The Division advised TMCC that, as another result of the violation, it would have to buy the motorcycles back from PPHD. TMCC did not do so.

PPHD filed a complaint against TMCC asserting the claims identified above, and ultimately filed an amended complaint adding a fourth claim for damages caused by Todd Erdmann's violation of section 12–6–120(1) in his role as TMCC's manufacturer representative.

PPHD alleged at trial that TMCC's violation of section 12–6–102.5 constituted a breach of the dealer contract because PPHD could not act as a dealer for TMCC's motorcycles, and that TMCC knew or should have known that its representations that PPHD could act as a lawful motor vehicle dealer were false. It also contended that TMCC violated section 12–6–120(1)(*l*)(I), C.R.S.2010, which provides that it is unlawful for a manufacturer to fail to pay the dealer, within ninety days after the termination or nonrenewal of a franchise, the cost of unsold motor vehicles in the dealer's inventory that were acquired from the manufacturer within the previous twelve months.

The trial court found in favor of PPHD on its breach of contract claim (under a Uniform Commercial Code (UCC) implied warranty theory), but found in TMCC's favor on PPHD's claims for statutory violations and negligent misrepresentation.

## II. TMCC's Appeal

### A. Breach of Contract and Amended Complaint

Following PPHD's case-in-chief, TMCC moved to dismiss the breach of contract claim, contending that even though there may have been a technical breach of section 12–6–120.5, the evidence was undisputed that PPHD suffered no interference in its ability, as a dealer, to sell TMCC's motorcycles during the term of the dealer contract.

The court denied TMCC's motion, concluding that there "has been at least a threshold case for a[UCC] breach of warranties under the contract." After TMCC presented its defense case, it asserted it had no notice of the UCC theory and was in an "unfair position" because PPHD had not previously raised the issue. The court permitted the parties, at TMCC's request, to file written closing arguments to address whether the UCC applied.

PPHD, both in its written closing argument and its reply to TMCC's written closing argument, clarified that it asserted two separate claims for breach of contract. The first was a breach of the implied warranties flowing from the December 2005 sales contract, which is governed by the UCC. The second was an express breach of the January 2006 dealer contract, based on TMCC's statutory violations. In its reply, it requested the court to amend its pleadings to conform to the evidence on the breach of warranty claim, pursuant to C.R.C.P. 15.

TMCC, in its written closing argument, objected to the court's sua sponte injection and consideration of a UCC theory of breach of implied warranties, because PPHD never brought a claim for breach of the December 2005 sales contract, much less a breach of implied warranties flowing from that contract. It argued that PPHD did not present evidence to support the breach of implied warranties flowing from the sales contract, and noted that PPHD implicitly acknowledged in its closing argument brief that the dealer contract did not provide the basis for the UCC claim.

The court granted PPHD's request to amend the pleadings to conform to the evidence and entered a judgment in favor of PPHD on the UCC claim. It ruled that even if TMCC was surprised by the court's injection of a UCC issue, the court could not "ignore the UCC[ ] any more than [it] could ignore the standards set forth in the Colorado Jury Instructions in a jury trial." It concluded that TMCC was not prejudiced by amending the breach of contract claim to include a UCC claim because "[b]oth sides presented all the facts that were relevant" and had the opportunity to address the UCC

in written closing arguments. The court relied on a provision in the dealer contract as the basis for a UCC claim, and ruled that TMCC breached implied warranties of merchantability, fitness for a particular purpose, and title flowing from that provision, and it imposed UCC remedies for TMCC's failure to cure following PPHD's revocation of acceptance of the motorcycles.

1. Standard of Review and Applicable Law

■ The determination whether to allow a party to amend a pleading is committed to the district court's sound discretion. *Lyons v. Teamsters Local Union No. 961*, 903 P.2d 1214, 1222 (Colo.App.1995). Accordingly, we will not reverse a district court's decision to permit such an amendment absent a showing of an abuse of that discretion. *Id.*

C.R.C.P. 15(b) governs and allows for amendment of the pleadings to conform to the evidence. This rule provides, in pertinent part:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

■ A trial court has a duty to consider an issue raised by the evidence even though the matter was not pled and no formal application was made to amend. *Padilla v. Ghuman*, 183 P.3d 653, 658 (Colo.App.2007). But before the court may consider an unpled issue, it must appear that the issue was deliberately presented at trial. *Cady v. Fraser*, 122 Colo. 252, 222 P.2d 422, 424 (1950); *see Command Commc'ns, Inc. v. Fritz Cos.*, 36 P.3d 182, 187 (Colo.App.2001). The court may allow such an amendment only where there is no reasonable doubt that the issue raised by the proposed amendment has been intentionally and actually tried by the parties. *Buena Vista Bank & Trust Co. v. Lee*, 191 Colo. 551, 553, 554 P.2d 1109, 1110

(1976); *Real Equity Diversification, Inc. v. Coville,* 744 P.2d 756, 759 (Colo.App.1987). It is not sufficient that some evidence has been received germane to the issue sought to be raised. *Bill Dreiling Motor Co. v. Shultz,* 168 Colo. 59, 65, 450 P.2d 70, 73 (1969); *Lyons,* 903 P.2d at 1222.

### 2. Discussion

TMCC contends that, because the parties did not intentionally and actually try a UCC claim, the trial court abused its discretion when it permitted PPHD to amend the pleadings after trial to include a claim of breach of implied warranties under the UCC. We agree.

The record reflects the following:

• PPHD did not plead a breach of implied warranties under the UCC.

• Before trial, TMCC filed a C.R.C.P. 56(h) motion for a determination of law and clarification of the claims to be decided at trial. In its motion, TMCC asserted, and PPHD did not dispute, that "this case [did] not involve any allegations of a failure to perform warranties." PPHD confirmed in its response that its four claims for relief were "each based on statutory violations of the regulations pertaining to automobile manufacturers and manufacturer representatives as found in C.R.S. 12–6–101 et seq."

• During the trial, neither party mentioned the UCC, nor did either party adduce any testimony discussing implied warranties under the UCC.

• At the conclusion of the evidence, the court acknowledged that it "seem[ed] to have sprung the [UCC claim] on everybody."

• TMCC asserted it had no notice of the UCC claim and was in an "unfair position" because the issue was not previously raised.

■ We conclude on this record that the parties did not intentionally and actually try a UCC claim. *See Real Equity Diversification,* 744 P.2d at 759. Instead, the trial court sua sponte injected the implied warranty issue after PPHD presented its case. Where, as here, a claim is not pled or intentionally and actually tried, a court cannot render a judgment thereon. *Dinosaur Park Investments, L.L.C. v. Tello,* 192 P.3d 513, 518 (Colo.App.2008). This rule cannot be circumvented by allowing a party to amend his or her pleading after trial, as the court did here. *Id.*

We also conclude that TMCC was clearly prejudiced by the amendment because the trial court rendered judgment, not on the UCC issue as argued by PPHD in its closing argument brief, which focused on the implied warranties arising out of the December 2005 sales contract, but instead on a different UCC claim arising from a provision in the dealer contract. *See id.* at 518. In so doing, the court deprived TMCC of the opportunity to respond to the distinct UCC theory that was the basis for the court's judgment. *Id.*

Accordingly, we conclude the court abused its discretion by allowing the amendment and entering judgment on the amended claim. We therefore reverse the trial court's judgment granting PPHD relief based on breach of implied warranties under the UCC, and remand for reconsideration of PPHD's breach of contract claim as it was actually tried by the parties.

### B. Damages, Attorney Fees, and Costs

The trial court based its award of damages, attorney fees, and costs exclusively on a UCC claim for breach of implied warranties. In light of our decision above, we reverse the court's award of damages, attorney fees, and costs to PPHD.

### III. PPHD's Cross–Appeal

PPHD contends the trial court erred in concluding that TMCC was not liable for damages resulting from violations of section 12–6–120(1)(d), (h), and (*l*). We reverse the court's judgment as to section 12–6–120(1)(h) and we remand for findings on PPHD's claim that it was entitled to parts costs under section 12–6–120(1)(*l*)(I)(B). We reject its remaining contentions.

### A. Standard of Review

PPHD's arguments raise issues of statutory interpretation, and therefore our review is

de novo. *Dubois v. People,* 211 P.3d 41, 43 (Colo.2009).

"In resolving an issue of statutory interpretation, 'a court's essential task is to determine and give effect to the intent of the legislature.'" *Premier Farm Credit, PCA v. W–Cattle, LLC,* 155 P.3d 504, 513 (Colo.App. 2006) (quoting in part *People v. Goodale,* 78 P.3d 1103, 1107 (Colo.2003)). To determine the legislature's intent, we must first look to the plain language of the statute. *People v. Manzo,* 144 P.3d 551, 554 (Colo.2006). If the statutory language is clear and unambiguous, we interpret the statute according to the plain and ordinary meaning of its terms. *Premier Farm Credit,* 155 P.3d at 513.

### B. Discussion

#### 1. Section 12–6–120(1)(d): Nonrenewal of Dealer Franchise Agreement

PPHD first contends that the trial court erroneously concluded that TMCC did not violate section 12–6–120(1)(d), which makes it unlawful for a manufacturer to cancel a dealer franchise agreement by nonrenewal without "just cause." We perceive no error.

Here, the trial court found there was "just cause" for nonrenewal of the dealer contract because (1) the contract explicitly provided for a one-year term, (2) PPHD never made a timely demand for renewal, and (3) PPHD had made several judicial admissions that the dealer contract had been terminated by mutual agreement of the parties.

PPHD asserts that the above facts do not constitute "just cause" because, under section 12–6–120(1)(d), "just cause" is limited to only those situations enumerated in the statute and does not include termination due to nonrenewal language in a dealer contract. PPHD asserts, in the alternative, that if "just cause" includes nonrenewal by the contract's own terms, the parties renewed the contract, and thus the termination was without "just cause." We are not persuaded by either contention.

Section 12–6–120(1)(d)(I) makes it unlawful for a manufacturer to cancel a dealer franchise without "just cause." Under subsection (1)(d)(II), "'just cause' shall be determined in the context of all circumstances surrounding the cancellation or nonrenewal, including but not limited to" six enumerated examples, all of which are either financial considerations or failures of performance by a dealer. *See* § 12–6–120(1)(d)(II)(A)–(F).

PPHD argues that, under the statute, a dealer contract must automatically continue, unless there is "just cause" to terminate the contract, *as defined in* section 12–6–120(1)(d)(II)(A) through (F). We disagree with PPHD's narrow interpretation of the statute for two reasons. First, the statute requires a court to consider "the context of all circumstances surrounding the cancellation or nonrenewal" of the contract. Second, we decline to treat the statute's language that immediately precedes (A) through (F)— "including, but not limited to"—as restrictive. *Cf. Amos v. Aspen Alps 123 LLC,* 298 P.3d 940, 959 (Colo.App.2010) (*cert. granted* Mar. 28, 2011) (citing *Childers v. State,* 936 So.2d 585, 597 (Fla.Dist.Ct.App.2006)); *see also A Dictionary of Modern Legal Usage* 432 (B. Garner ed., 2d ed. 1995) ("Including but not limited to" is "often essential to defeat [the] canon[ ] of construction: inclusio unius est exclusio alterius ('To express one thing is to exclude the other').").

Given our conclusion that "just cause" may be established by nonrenewal as set forth by the terms of the contract, we turn to PPHD's assertion that termination was unjust because the parties renewed the contract by their conduct.

The dealer contract provided that it would "be renewed on an annual basis only on the joint concurrence of [PPHD] and TMCC," and it specified that TMCC "was under no obligation to renew [it] at any time."

PPHD asserts that the parties intended that the contract continue indefinitely, as demonstrated by TMCC's listing of PPHD as a dealer in its 2007 license renewal with the State. While there is some record support for this contention, the court found, also with record support, that under the terms of the dealer contract, it could be renewed only "upon joint agreement" and that the respective owners of TMCC and PPHD did not discuss renewal of the agreement. Erdmann, TMCC's owner, testified that the con-

tract contained the express agreement and intention of the parties to renew the contract if they mutually consented to do so. Robert Brooks, PPHD's owner, testified that he made a mistake by not renewing the dealer contract and intended to renew it, but acknowledged that he "did not send something to the manufacturer, to say that [PPHD was] interested in continuing for another year," and agreed, therefore, that the contract was terminated in January 2007 by its own terms. He also testified that his interrogatories, PPHD's complaint, and PPHD's amended complaint "unfortunately," but "correctly," stated PPHD's position: "[N]o mutual consent was entered by the parties to continue the contractual relationship on the anniversary date of the contract. As such, the contract terminated on January 18, 2007, by its terms."

We conclude that there was record support for the trial court's finding that, absent discussions or a demand for renewal, the one-year dealer contact had been terminated by mutual agreement of the parties. Accordingly, we perceive no error in the trial court's conclusions that there was "just cause" for nonrenewal of the dealer contract, and thus, TMCC did not violate subsection 12–6–120(1)(d).

### 2. Violation of Section 12–6–120(1)(h): Independent Control of Dealer Under Section 12–6–120.5

PPHD contends that the trial court erroneously determined that it was not entitled to recover for its loss or damage caused by TMCC's and Erdmann's violation of section 12–6–101(1)(h). While we agree with the court that PPHD did not have a claim for treble damages, we agree with PPHD that it could recover for its actual loss or damages.

Section 12–6–120(1)(h) makes it "unlawful and a violation of this part 1" for a manufacturer or manufacturer representative to "violate any duty imposed by, or fail to comply with, any provision of section . . . 12–6–120.5."

Section 12–6–120.5, the independent control of dealer provision, in turn, makes it unlawful for a manufacturer to own a motor vehicle dealer.

A person or a licensee has a "right of action for loss" or damage caused by the unlawful acts of a manufacturer, distributor, or manufacturer representative. *See* § 12–6–122(2)–(3), C.R.S.2010.

Section 12–6–122(2) provides:

If any person suffers any loss or damage by reason of any unlawful act as provided in section 12–6–120(1)(a) [the failure to perform written warranties], such person shall have a right of action against the manufacturer, distributor, or manufacturer representative. In any court action wherein a manufacturer, distributor, or manufacturer representative has been found liable in damages to any person under this part 1, *the amount of damages so determined shall be trebled* and shall be recoverable by the person so damaged. Any person so damaged shall also be entitled to recover reasonable attorney fees as part of his or her damages.

(Emphasis added.)

Section 12–6–122(3) provides:

If any licensee suffers any loss or damage because of a violation of section 12–6–120(1) . . . the licensee shall have a right of action against the manufacturer, distributor, or manufacturer representative. In any court action wherein a manufacturer, distributor, or manufacturer representative has been found liable in damages to any licensee under this part 1, any licensee so damaged shall also be entitled to recover reasonable attorney fees and costs as part of his or her damages.

The trial court found that TMCC and Erdmann violated section 12–6–120.5, the independent control of dealer provision, but it declined to award PPHD treble damages under section 12–6–122 by finding that:

● section 12–6–122 does not include a violation of the independent control of dealer provision in its definition of "unlawful acts," and

● PPHD was aware of TMCC's other dealerships and would have been made aware of the independent control of dealer prohibitions when it applied to be a franchise dealer.

■ As to the court's first reason barring recovery, we agree that the treble damages provision of section 12–6–122(2) does not apply to a violation of the independent control of dealer provision. Section 12–6–122(2), by its own terms, only creates a right of action for a person's loss or damage caused by the manufacturer's failure to perform written warranties under section 12–6–120(1)(a). We are not persuaded by PPHD's related assertion that an award of treble damages under section 12–6–122(2) could apply to any unlawful act under section 12–6–120(1) because it references liability "under this part 1." Reading this section as a whole, as we must, the introductory sentence of subsection (2) expressly limits the right of action to "loss or damage [suffered] by reason of any unlawful act as provided in section 12–6–120(1)(a)."

However, the damages provision of section 12–6–122(3) defines "unlawful act" more expansively and creates a right of action for a licensee's loss or damage caused by any unlawful act proscribed by section 12–6–120(1).

Because section 12–6–120(1)(h) expressly includes a violation of the independent control of dealer provision as an "unlawful act," we conclude that the court erroneously interpreted section 12–6–122 to preclude recovery for this violation.

■ Thus, while we agree with the court that PPHD did not have a claim for treble damages, we conclude that, under section 12–6–122(3), PPHD could recover for its loss or damage caused by TMCC's and Erdmann's violation of the independent control of dealer provision.

■ As to the court's second reason for barring recovery—that PPHD had prior notice of the violation—we conclude that, even assuming PPHD had such notice, it would not bar a right to recovery under section 12–6–122(3). Nothing in the plain language of the statute precludes recovery on this basis. And the court did not rely on, nor have we found, any case interpreting this statute as creating a duty of inquiry or as barring recovery on the basis of prior notice. Moreover, as the trial court found, PPHD did not have notice that the violation would result in the State's refusing to title the motorcycles

upon resale. Accordingly, we reverse the trial court's denial of an award of damages under section 12–6–122.

### 3. Violation of Section 12–6–120(1)(*l*): Manufacturer Repurchase

PPHD contends the trial court erred in concluding that TMCC was not obligated to repurchase its motorcycles and parts following termination of the dealer contract. We disagree with regard to repurchase of the motorcycles, but agree the court failed to consider whether TMCC was obligated to repurchase parts and remand for further findings.

As pertinent here, section 12–6–120(1)(*l*)(I)(A) provides:

> It shall be unlawful and a violation of this part 1 for any manufacturer ... [t]o fail to pay to a motor vehicle dealer, within ninety days after the termination, cancellation, or nonrenewal of a franchise ... [t]he dealer cost ... of unused, undamaged, and *unsold motor vehicles in the motor vehicle dealer's inventory that were acquired from the manufacturer ... within the previous twelve months.*

(Emphasis added.)

Subsection (1)(*l*)(I)(B) of the statute also requires that the dealer receive its costs for "all unused, undamaged, and unsold supplies, parts, and accessories in original packaging and listed in the manufacturer's current parts catalog." § 12–6–120(1)(*l*)(I)(B).

The trial court found that PPHD had acquired the motorcycles, as that term is used in section 12–6–120(1)(*l*)(I)(A), in December 2005. Because the franchise agreement expired on January 18, 2007, more than twelve months after PPHD acquired the motorcycles, the court held that TMCC was under no obligation to repurchase the motorcycles.

PPHD contends the legislature intended the term "acquired" to mean a transfer of title from owner to buyer. PPHD contends it did not acquire the motorcycles until May 2006, when it paid in full for the motorcycles, and received full title for them upon receiving MSOs from TMCC. However, the court found PPHD acquired the motorcycles in December 2005, when it took possession of,

and received bills of sale for, the motorcycles. We are not persuaded that "acquired" commands the narrow construction PPHD proposes.

"Acquired" is not defined in sections 12–6–101 to –128. However, it is a word of common usage that has an unambiguous meaning. *Webster's Third New International Dictionary* 18 (2002) defines "acquire" as "to come into possession, control, or power of disposal of often by some uncertain and unspecified means...." *See also Black's Law Dictionary* 26 (9th ed. 2010) (defining "acquire" as "gaining possession or control of; to get or obtain."). Here, the General Assembly used the term "acquire" in conjunction with the phrase "motor vehicles in the motor vehicle dealer's inventory." Thus, the operative date commencing the twelve-month period is the date that PPHD obtained the motorcycles in its inventory.

■■■ PPHD, nonetheless, relies on *Guy Martin Buick, Inc. v. Colorado Springs National Bank*, 184 Colo. 166, 171–72, 519 P.2d 354, 357 (1974), which held that under the Certificate of Title Act (Act), no right, title, or interest in a vehicle is "acquire[d]" by a buyer until the payment is made and title to the vehicle is delivered. *See* § 42–6–109, C.R.S.2010 (substantially similar provision formerly codified at § 13–6–8 and then at § 42–6–108 until amendment and relocation in 1994). However, the Act was designed to allow purchasers to readily and reliably ascertain the status of a seller's title without recourse to official state records. *Guy Martin*, 184 Colo. at 171–72, 519 P.2d at 357. The Act does not govern the respective rights of the parties to a sale. *Sachtjen v. Am. Family Mut. Ins. Co.*, 49 P.3d 1146, 1149 (Colo.2002). Accordingly, the supreme court has held that "[t]he failure to deliver a certificate of title does not prevent the acquisition of ownership rights as between the parties to the transaction." *Colo. Auto & Truck Wreckers Ass'n v. Dep't of Revenue*, 618 P.2d 646, 654 (Colo.1980).

A number of Colorado appellate cases have also held in other contexts that the failure to deliver a certificate of title does not prevent the acquisition of ownership rights as between the parties to the transaction. *See*

*People v. Ayala*, 770 P.2d 1265, 1269 (Colo. 1989) (theft by receiving); *Valley Bank & Trust Bank v. Holyoke Cmty. Fed. Credit Union*, 121 P.3d 358, 360 (Colo.App.2005) (floor plan lending); *Hall v. Hong Seung Gee*, 725 P.2d 1164, 1166 (Colo.App.1986) (insurance coverage for recently purchased car); *Waggoner v. Wilson*, 31 Colo.App. 518, 507 P.2d 482 (1972) (oral agreement for sale of car).

■■■ Because the most recent pronouncements of the Colorado Supreme Court support the proposition that non-delivery of a certificate of title does not prevent a change of ownership, and that delivery of possession constitutes a transfer of ownership as between the parties involved, we conclude that, for the purposes of manufacturer repurchase under section 12–6–120(1)(*l*)(I)(A), PPHD "acquired" the motorcycles in December 2005, when it took possession of them. Because the parties' dealer contract terminated in January 2007, more than twelve months after the "acquire" date, we affirm the trial court's conclusion that TMCC was not obligated to repurchase its motorcycles. *See* § 12–6–120(1)(*l*)(I)(A).

The trial court did not make findings of fact or conclusions of law under section 12–6–120(1)(*l*)(I)(B) as to PPHD's claim for $3,625.65 in costs for parts, which claim is not constrained by a twelve-month period following acquisition. We therefore remand to permit the trial court to consider this claim.

On remand, if the trial court determines that PPHD is entitled to damages for TMCC's alleged violation of section 12–6–120(1)(*l*)(I)(B), the court should then consider whether PPHD is entitled to attorney fees or costs for that claim, pursuant to section 12–6–122(3).

## IV. Conclusion

The trial court's judgment that TMCC breached UCC implied warranties related to the sales contract is reversed, and the case is remanded for determination of the breach of contract claim as actually tried by the parties. The judgment is also reversed to the extent it denied an award of damages under

section 12–6–122(3) for TMCC's and Erdmann's violation of sections 12–6–120(1)(h) and 12–6–120.5 and to the extent it failed to determine PPHD's claim for reimbursement of its parts costs under section 12–6–120(1)(*l*)(I)(B), and the case is remanded for further proceedings consistent with this opinion on those claims. The judgment is affirmed in all other respects.

Judge DAILEY and Judge J. JONES concur.