The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
April 3, 2025

## 2025COA36

**No. 23CA1112, *People v. Claycomb* — Criminal Law — Jury Instructions — Definitional Instructions — Proximate Cause — Instructions Regarding Continued Deliberation**

For the first time in a reported case, a division of the court of appeals concludes that when the jury asks for a definition of "proximate cause" and that phrase is used in the jury instructions, the trial court must provide a definition. However, the division concludes that the error created by the trial court's failure to provide such an instruction was harmless in this case.

The division also addresses, for the first time in a reported Colorado case, the court's submission of a question to the jury near the end of the business day about the status of its deliberations and providing various options for future deliberations. Although the division cautions against the potential dangers of making such an

inquiry, it concludes that the trial court did not err by doing so in this instance.

Court of Appeals No. 23CA1112
Boulder County District Court No. 21CR311
Honorable Patrick Butler, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Hunter Claycomb,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SCHUTZ
Welling and Kuhn, JJ., concur

Announced April 3, 2025

Philip J. Weiser, Attorney General, William G. Kozeliski, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Springer and Steinberg, P.C, Harvey A. Steinberg, Stephen M. Burstein,
Taylor Ivy, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Hunter Claycomb, appeals the judgment of conviction entered on jury verdicts finding him guilty of careless driving resulting in death and speeding. As a matter of first impression, we conclude that, when a jury asks for the definition of "proximate cause" and that phrase is used in the jury instructions, the trial court must provide the definition. We also address for the first time the use of a "getting close to 5" jury instruction. Although we caution against the potential dangers of such an instruction, we conclude that the trial court did not err by using it in this instance. We affirm Claycomb's conviction.

## I.    Background

¶ 2    The Colorado State Patrol (CSP) responded to a two-vehicle collision that occurred at an intersection in Boulder County. The CSP determined that the two vehicles involved were a sedan driven by Claycomb and a truck driven by Robert Melanson, who was accompanied by his wife, Cindi Melanson.

¶ 3    A CSP trooper observed that the two vehicles, located in the center median, were badly burned and there were "tire marks or skid marks" on the road. Based on an accident reconstruction, the trooper concluded that Claycomb had been driving over 100 miles

1

per hour in an area with a posted speed limit of 65 miles per hour when Melanson accelerated from a stop sign into the intersection. The trooper further concluded that Claycomb "impacted Mr. Melanson's vehicle at 96 miles per hour, sending both vehicles rolling southbound an unknown number of times before coming to rest in the center median," and that "Mr. Melanson and his wife Cindi Melanson were ejected from their vehicle and killed."

¶ 4    Claycomb was charged with two counts of vehicular homicide, one count of reckless driving, one count of speeding, and one count of violation of bond conditions that was later dismissed.

¶ 5    At trial, the CSP trooper, a second expert for the prosecution, and a defense expert testified regarding their analyses of and conclusions as to what occurred leading to the collision. The three experts reached slightly different conclusions based on highly technical calculations.

¶ 6    In closing argument, the prosecutor argued that Claycomb "plowed down the [highway] going 105 to 117 miles per hour and T-boned the [truck]," proximately causing the Melansons' deaths.

¶ 7    The theory of defense was that the Melansons' truck "was the proximate cause of the accident as it left a place of safety behind a

2

stop sign, accelerating at full speed through the intersection, and taking the right of way from Mr. Claycomb."

¶ 8    Claycomb requested that the trial court instruct the jury on the lesser included offense of careless driving, define the culpable mental state for careless driving, and give an intervening cause instruction.  The court gave the careless driving elemental instruction, but it declined to define the mental state for careless driving or give an intervening cause instruction.

¶ 9    Approximately one and a half hours into deliberations, the jury simultaneously asked two questions relating to how long it had to deliberate.  In a written response, the trial court instructed the jury to continue deliberating.

¶ 10    Later, the jury asked the trial court to provide a definition of "proximate cause."  Over defense counsel's objection, the court referred the jury back to the original instructions and directed it to use the common meaning of the undefined terms in the instructions.

¶ 11    At approximately 4:45 p.m., the trial court gave the jury what it called a "getting close to 5 instruction," asking the jury to indicate whether it (1) wanted to break for the day and resume deliberations

on Monday; (2) was close to reaching a verdict and wanted to continue deliberating until 5:30 p.m.; or (3) had reached a verdict. Upon receipt of the court's inquiry, the jury asked the court: "Do we have to come back on Monday even if we make a decision by 5:30?" The court responded: "No. If you reach a verdict by 5:30, you will not have to come back on Monday." The jury chose to continue deliberating and reached a verdict just before 5:30 p.m.

¶ 12    The jury found Claycomb guilty of careless driving resulting in death and speeding at least twenty-five miles per hour over the limit.

## II.    Discussion

¶ 13    Claycomb contends that his conviction for careless driving resulting in death should be reversed because the trial court failed to properly instruct the jury on the law. Specifically, he argues that the trial court (1) failed to define the culpable mental state required for careless driving; (2) improperly rejected his proposed intervening cause instruction; (3) failed to define "proximate cause" for the jury; and (4) erred by instructing the jury to continue deliberating without first inquiring about the status of its deliberations.

## A. Standards of Review and Reversal

¶ 14 A trial court has a duty to properly instruct the jury on the applicable law. *People v. Jones*, 2018 COA 112, ¶ 24. We review de novo whether the trial court's instructions, read as a whole, correctly instructed the jury on the controlling law. *Tibbels v. People*, 2022 CO 1, ¶ 22. But we review "a trial court's decision to give, or not to give, a particular jury instruction for an abuse of discretion." *People v. Payne*, 2019 COA 167, ¶ 16. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or it is based on a misunderstanding or misapplication of the law. *People v. Knapp*, 2020 COA 107, ¶ 31.

¶ 15 We generally review preserved claims of instructional error for nonconstitutional harmless error, reversing only if the error substantially influenced the verdict or affected the fairness of the trial proceedings. *People v. Koper*, 2018 COA 137, ¶ 9.

¶ 16 However, when a trial court improperly instructs a jury on an element of an offense, "either by omitting or misdescribing that element," we review for constitutional harmless error. *Griego v. People*, 19 P.3d 1, 8 (Colo. 2001). "A constitutional error is harmless when the reviewing court is confident beyond a

5

reasonable doubt that the error did not contribute to the verdict obtained." *Id.* at 8-9.

### B.    Applicable Law

¶ 17    As relevant here, a person commits careless driving when they "drive[] a motor vehicle . . . in a careless and imprudent manner, without due regard for the width, grade, curves, corners, traffic, and use of the streets and highways and all other attendant circumstances." § 42-4-1402(1), C.R.S. 2024.

### C.    The Culpable Mental State for Careless Driving

¶ 18    Claycomb contends that the trial court reversibly erred by failing to instruct the jury on the meaning of "without due regard" as used in the careless driving elemental instruction. He argues that his proposed instruction was necessary to avoid confusing the jury because "reckless" was the only mental state defined in the instructions. We disagree.

### 1.    Additional Facts

¶ 19    Claycomb's proposed instruction identifying the culpable mental state of careless driving as "without due regard" and defining that phrase read as follows:

Careless Driving is committed when the defendant has committed a voluntary act prohibited by law accompanied by a culpable mental state. Voluntary act means an act performed consciously as a result of effort or determination. The culpable mental state required for Careless Driving is "without due regard" as explained in this instruction. Proof of the commission of the act alone is not sufficient to prove the defendant had the required culpable mental state. The culpable mental state is as such [sic] an element of the crime as the act itself and must be proven beyond a reasonable doubt, either by direct or circumstantial evidence.

"Without due regard" means a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect himself or others from bodily injury or death.

¶ 20 The trial court stated that it was "not inclined" to give Claycomb's proposed definitional instruction because "without due regard" is not defined in the model criminal jury instructions and the elemental instruction "basically defines what careless driving is" such that there is no need to "define it further."

¶ 21 Defense counsel objected, arguing that the proposed instruction was largely based on a comment to the careless driving jury instruction in the model instructions, which cited *People v.*

*Zweygardt*, 2012 COA 119, in defining "without due regard." Counsel also argued that the proposed instruction would be helpful to the jury because the instruction for reckless driving included a definition of "reckless," and without a separate culpable mental state instruction for careless driving, the jury could be left confused.

¶ 22    The prosecutor responded that the use of excerpts from opinions as jury instructions is disfavored and noted that the *Zweygardt* opinion did not include the definition of "without due regarding" contained in the tendered instruction. The trial court maintained its ruling.

### 2.    Law and Analysis

¶ 23    "The mental element of careless driving is, in essence, negligence; *i.e.*, the 'careless and imprudent' frame of mind indicating the absence of due care." *People v. Chapman*, 557 P.2d 1211, 1213 (Colo. 1977). Since the trial in this case, a division of this court has further clarified that "carelessness in the careless driving statute, . . . under *Chapman*, is analogous to criminal negligence." *People v. Kirby*, 2024 COA 20, ¶ 46.

¶ 24     And in *Zweygardt,* a division of this court explained that the culpable mental state for careless driving is "without due regard." *Zweygardt,* ¶ 32 (quoting § 42-4-1402(1)).  The division went on to say that "[a] person who grossly deviates from the standard of care that a reasonable person would exercise and fails to perceive a substantial and unjustified risk that a result will occur or that a circumstance exists, has necessarily acted without due regard for safety."  *Id.* at ¶ 34.

¶ 25     The culpable mental state for careless driving is not defined by statute or included as a model criminal jury instruction.  There is, however, a comment to the model criminal jury instruction for careless driving that cites and quotes portions of *Zweygardt.* COLJI-Crim. 42:15 cmt. 3 (2024).

¶ 26     Generally, instructions that accurately track the language of applicable statutes and pattern instructions are sufficient.  *People v. Gallegos,* 260 P.3d 15, 26 (Colo. App. 2010).  The pattern instructions, however, do not necessarily reflect the controlling law. *People v. Cox,* 2021 COA 68, ¶ 20 ("[P]attern jury instructions are not law, not authoritative, and not binding . . . ." (quoting *Krueger v. Ary,* 205 P.3d 1150, 1154 (Colo. 2009))).  And simply because a

tendered instruction does not exist in the model criminal jury instructions does not mean that the tendered instruction is erroneous. *See Garcia v. People*, 2019 CO 64, ¶ 22 (Model jury instructions "are not a safe harbor that insulates instructional error from reversal.").

¶ 27 A definitional instruction is not required for a term or phrase familiar to a reasonable person of common intelligence, especially when the term's "meaning is not so technical or mysterious as to create confusion in jurors' minds." *People v. Thoro Prods. Co.*, 45 P.3d 737, 745 (Colo. App. 2001), *aff'd*, 70 P.3d 1188 (Colo. 2003).

¶ 28 In our view, while it certainly would have been within the trial court's discretion to separately instruct the jury on the meaning of "without due regard," *see Payne*, ¶ 16, the court did not abuse its discretion by not giving Claycomb's tendered instruction.

¶ 29 We base our conclusion, first, on the fact that, although "reckless" was the only culpable mental state defined in the jury instructions, the provided careless driving instruction tracked the statutory language and the model criminal jury instruction. *See* § 42-4-1402(1); COLJI-Crim. 42:15; *Gallegos*, 260 P.3d at 26. And

no binding Colorado precedent requires a separate instruction for the culpable mental state of careless driving.

¶ 30    Second, because "without due regard" does not have a statutory definition, the jury should have given the phrase its ordinary meaning. *See People v. Walden*, 224 P.3d 369, 379 (Colo. App. 2009) ("When definitions are not provided in a jury instruction, the jury is presumed to employ the common meaning of the words used."); *People v. Harper*, 205 P.3d 452, 456 (Colo. App. 2008) (A court should instruct the jury to employ the common meaning of a word when the word lacks a "special statutory definition.").

¶ 31    Third, the phrase "without due regard" is "not so technical or mysterious as to create confusion in jurors' minds." *Thoro Prods. Co.*, 45 P.3d at 745. Rather, its ordinary meaning is "the absence of due care." *Chapman*, 557 P.2d at 1213.

¶ 32    Fourth, the jury did not express any confusion regarding what the phrase means. *Payne*, ¶ 18. And Claycomb does not explain how the jury would have attributed an incorrect meaning to it.

¶ 33    Finally, the specific definition of "without due regard" set forth in Claycomb's tendered instructions did not accurately quote the definition of "without due regard" provided by *Zweygardt*, ¶ 34.

There, the court stated: "A person who grossly deviates from the standard of care that a reasonable person would exercise and fails to perceive a substantial and unjustified risk that a result will occur or that a circumstance exists, has necessarily acted without due regard for safety." *Id.* Instead of using this language, the tendered instruction quoted a civil definition of negligence. *See* CJI-Civ. 9:6 (2023) ("Negligence means a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect (oneself or) others from (bodily injury) (death) . . . .").

¶ 34    Relatedly, Claycomb also argues that, even if the trial court properly concluded that his counsel's tendered instruction was not appropriate, the court was nonetheless obligated to sua sponte provide a correct instruction to the jury. He cites *Riley v. People*, 266 P.3d 1089, 1092 (Colo. 2011), for the proposition that "[t]he trial court has a duty to instruct the jury on all matters of law applicable to the case."

¶ 35    We review this argument for plain error because Claycomb did not object at trial on this ground. *See People v. Miller*, 821 P.2d

12

881, 882 (Colo. App. 1991). An error is plain only if it is obvious and substantial. *Hagos v. People*, 2012 CO 63, ¶ 14. Error is obvious when it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law. *People v. Pollard*, 2013 COA 31M, ¶ 40. Any error here was not obvious because the model criminal jury instructions do not contain a definition for the culpable mental state for careless driving, and no authority requires the giving of such an instruction. Therefore, the court's failure to sua sponte provide the jury with an instruction defining "without due regard" did not rise to the level of plain error.

¶ 36 For these reasons, we conclude that the trial court did not err by declining to give the jury Claycomb's tendered instruction for the culpable mental state for careless driving.

## D.    The Intervening Cause Instruction

¶ 37    Claycomb contends that the trial court erred by rejecting his intervening cause instruction.[1]  We disagree.

### 1.    Additional Facts

¶ 38    Claycomb proposed the following jury instruction on intervening cause:

> A defendant does not cause the death of or serious bodily injury to another if there was an independent intervening cause.  A defendant is responsible for the death of another if the death is a natural and probable consequence of his misconduct.  Unlawful conduct which is broken by an independent intervening cause cannot be the proximate cause of the death of another.

Defense counsel argued that the evidence supporting the proposed instruction

> would be the [victims' truck] proceeding into the intersection, taking the right [of] []way from Mr. Claycomb, Your Honor.

---

[1] Claycomb contends that intervening cause is an affirmative defense, while the People assert that it is actually a traverse.  We do not need to resolve this dispute because, regardless of which party is correct, an "intervening cause defense is treated like an affirmative defense or a theory of defense for the purpose of determining the quantum of evidence necessary to submit the issue to the jury."  *People v. Saavedra-Rodriguez*, 971 P.2d 223, 228 (Colo. 1998); *People v. Smoots*, 2013 COA 152, ¶ 9, *aff'd sub nom. Reyna-Abarca v. People*, 2017 CO 15.

> The theory of the government's case is that the speeding of Mr. Claycomb led to this accident. As the Court has already indicated, through our theory of defense, the truck entering the roadway took that right of way and would be the independent, interceding cause leading to or being the proximate cause of the accident.

¶ 39    The prosecutor countered by citing cases rejecting an intervening cause instruction when the asserted intervening act would constitute only simple negligence. *See, e.g., People v. McAfee*, 104 P.3d 226, 230 (Colo. App. 2004) (simple negligence, such as failing to use a seatbelt, is foreseeable and does not rise to the level of gross negligence, which is necessary to constitute an intervening cause).

¶ 40    The trial court rejected Claycomb's proposed instruction, disagreeing that the Melansons' truck entering the intersection was an independent, intervening cause.

## 2.    Law and Analysis

¶ 41    "An independent intervening cause is an act of an independent person or entity that destroys the causal connection between the defendant's act and the victim's injury and[] thereby becomes the cause of the victim's injury." *People v. Saavedra-Rodriguez*, 971 P.2d 223, 225-26 (Colo. 1998).  "For an independent intervening

cause to relieve a defendant of liability it must not be reasonably foreseeable." *Id.* at 226.

¶ 42　　To be foreseeable, an act must be "likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct." *Garcia v. Colo. Cab Co.*, 2023 CO 56, ¶ 22 (quoting *Taco Bell, Inc. v. Lannon*, 744 P.2d 43, 48 (Colo. 1987)). Simple negligence is foreseeable, while gross negligence is not. *See Saavedra-Rodriguez*, 971 P.2d at 226. Simple negligence is generally defined as "a failure to do an act which a reasonably careful person would do, or the doing of an act which a reasonably careful person would not do, under the same or similar circumstances to protect oneself or others from bodily injury." *Bedee v. Am. Med. Response of Colo.*, 2015 COA 128, ¶ 12; *see also* CJI-Civ. 9:6. "Gross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others." *Martinez v. People*, 2024 CO 6M, ¶ 14 (quoting *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011)); *see also People v. Lopez*, 97 P.3d 277, 282 (Colo. App. 2004) (Gross negligence is abnormal human behavior that

constitutes "an extreme departure from the ordinary standard of care.").

¶ 43     Here, Claycomb requested an intervening cause instruction on the basis that the evidence showed that the Melansons rapidly accelerated into the intersection before Claycomb's car collided with their truck, thereby taking the right of way from Claycomb.  When viewed in the light most favorable to Claycomb, this evidence arguably suggests that the Melansons, not Claycomb, caused the accident.  But, even in this light, the Melansons' actions, at most, constituted simple negligence.

¶ 44     We find *Lopez* instructive here.  There, the victim's daughter was driving at the speed limit when the daughter saw the defendant's car approaching.  *Lopez*, 97 P.3d at 282.  The daughter determined she could safely turn left in front of the defendant's car and proceeded to do so.  *Id.*  The defendant was driving over the speed limit, but the daughter decided she could safely clear the intersection by accelerating.  *Id.*  The defendant's car collided with the daughter's car, and the victim, who was not wearing a seatbelt, was thrown from the car and killed.  *Id.* at 278, 282.  The defendant was charged with, and convicted of, reckless vehicular homicide.

*Id.* at 278. On appeal, the defendant argued that the trial court had erred by not instructing the jury on intervening cause. *Id.* at 282. The division concluded that, although the daughter's decision to turn left and accelerate might have been a "driving error," it did not warrant an intervening cause instruction because it did not constitute "abnormal behavior." *Id.* The division reasoned that "even if she made misjudgments, nothing in the record show[ed] that [the daughter's] decisions to turn left and to accelerate in an attempt to avoid the collision constituted an extreme departure from the ordinary standard of care sufficient to support a finding of gross negligence." *Id.*

¶ 45    Similarly to *Lopez,* we cannot conclude that the truck proceeding into an intersection from a stop and accelerating to avoid a collision constituted gross negligence. It was not "willful and wanton conduct . . . committed recklessly, with conscious disregard for the safety of others." *Martinez,* ¶ 14 (quoting *Hamill,* 262 P.3d at 954). Nor was it abnormal human behavior constituting an extreme departure from the ordinary standard of care.

¶ 46     Claycomb attempts to distinguish *Lopez,* arguing that there is no indication that the victim in *Lopez* proceeded from the safety of a stop sign, as the Melansons did here.  We, however, do not see this as a meaningful distinction.  Like the victim in *Lopez,* the Melansons had to attempt to traverse the intersection at some point — and that they did so at the time and in the manner they did was not unforeseeable.

¶ 47     And because the Melansons' actions were not unforeseeable gross negligence, we conclude the trial court did not abuse its discretion by ruling that Claycomb was not entitled to an intervening cause instruction.  *Cf. Sheldon v. Higinbotham,* 444 P.2d 272, 274 (Colo. 1968) (evidence that the defendant was speeding, ran a stop sign, ignored the passengers' requests to slow down, and overturned the vehicle in an attempt to make a left-hand turn at too high a rate of speed was sufficient evidence of a willful and wanton disregard of the rights of others to submit the question of gross negligence to the jury).

## E.     Proximate Cause

¶ 48     Claycomb next contends that the trial court erred by failing to define "proximate cause" for the jury after it asked for a definition of

19

the phrase. Although we agree that the court erred, we conclude that the error was harmless.

### 1. Additional Facts

¶ 49     The term "proximate cause" appeared in the jury instructions in the theory of defense, the elemental instruction for vehicular homicide, and the interrogatory for the careless driving "resulting in death" sentence enhancer. The theory of defense was that the Melansons' truck was the proximate cause of the collision. As an element of vehicular homicide, the prosecution was required to prove beyond a reasonable doubt that Claycomb's "conduct [wa]s the proximate cause of the death of another." § 18-3-106(1)(a), C.R.S. 2024. And the interrogatory for careless driving resulting in death required the prosecution to prove beyond a reasonable doubt that Claycomb's actions were "the proximate cause of death to another." § 42-4-1402(2)(c).

¶ 50     During deliberations, the jury asked the trial court, "What is the definition of proximate cause?" Defense counsel argued that the court should provide the jury a definition because the phrase "proximate cause" was "part of the law of the case," and it has a "specific meaning at law that is not . . . the common

understanding." The prosecutor argued that an instruction was not necessary because, although the 1983 version of the model criminal jury instructions contained a definition of proximate cause, the drafters later determined it was appropriate to remove that instruction. The prosecutor also argued that using excerpts from an opinion as jury instructions is generally an unwise practice.

¶ 51 The trial court responded to the jury's question as follows: "You have received all of the law that you may consider to decide this case. When a word or term is not defined in the jury instructions, you should use the common meaning of that word or term." Although the court pointed out to counsel that the word proximate "tends to be confusing to a jury," the court based its response to the jury's question on the fact that the model criminal jury instructions did not contain a definition for proximate cause.

### 2. Law and Analysis

¶ 52 Proximate cause is defined as "a cause which in natural and probable sequence produced the claimed injury . . . [and] without which the claimed injury would not have been sustained." *People v. Stewart*, 55 P.3d 107, 116 (Colo. 2002) (quoting CJI-Crim. 9:10 (1983)); *see also Lopez*, 97 P.3d at 280 ("[A] defendant's conduct is

the cause of the victim's death in a criminal homicide if 'it began a chain of events the natural and probable consequence of which was the victim's death.'" (quoting *Saavedra-Rodriguez*, 971 P.2d at 225)).

¶ 53    "Proximate cause" is not defined in the current version of the model criminal jury instructions. When the model instructions were updated in 2014, the definition of proximate cause was removed. *Compare* COLJI-Crim. F (209) (2008) (the definition of proximate cause), *with* COLJI-Crim. F (2014) (not containing a definition of proximate cause). However, the 2014 updates included the addition of comments to a number of jury instructions, including the one for vehicular homicide, advising of potential juror confusion as to the meaning of "proximate." *See* COLJI-Crim. 3-1:12 cmt. 2 (2014) ("CJI-Civ. Ch. 9, § B (Causation) (2014) ('The [Colorado Supreme Court Committee on Civil Jury Instructions] has intentionally eliminated the use of the word "proximate" when instructing the jury on causation issues because the concept of proximate cause is adequately included in the instructions in this Part B and because the word "proximate" tends to be confusing to the jury.').". These comments still appear in the current version of the model instructions. *See* COLJI-Crim. 3-1:12 cmt. 2 (2024).

22

¶ 54    It is within the trial court's sound discretion to determine whether to provide the jury with additional written instructions in response to a jury question. *People v. Alvarado*, 284 P.3d 99, 101 (Colo. App. 2011). "When . . . the original instructions adequately informed the jury, no additional or supplemental instruction is required or recommended." *People v. Gilmore*, 97 P.3d 123, 132 (Colo. App. 2003).

> We presume that a jury understands the instructions it is given. However, when the jury indicates to the judge that it does not understand an element of the offense charged or some other matter of law central to the guilt or innocence of the accused, the judge has an obligation to clarify that matter for the jury in a concrete and unambiguous manner.

*Leonardo v. People*, 728 P.2d 1252, 1256 (Colo. 1986). "Where . . . a jury affirmatively indicates that it has a fundamental misunderstanding of an instruction it has been given, the basis for a presumption that the jury understands the instruction disappears." *Id.* at 1255. "A jury should be referred back to instructions only when it is apparent that the jury has overlooked some portion of the instructions or when the instructions clearly answer the jury's inquiry." *Id.*

¶ 55    Here, although the trial court referred the jury back to the original instructions, the original instructions used the phrase "proximate cause" on three occasions but contained no definition of the phrase. We conclude the original instructions did not clearly answer the jury's question as to the meaning of proximate cause. And "[r]eferring the jury back to the same instruction that created the doubt in their minds could serve no useful purpose." *Id.*

¶ 56    Furthermore, proximate cause is an element of vehicular homicide, and the prosecution also had to prove proximate cause to establish the "resulting in death" sentence enhancer for careless driving. Whether the prosecution had proved beyond a reasonable doubt that Claycomb's actions were, as a legal matter, the proximate cause of the Melansons' deaths was a question of fact central to the jury's determination of Claycomb's guilt. The trial court therefore should have clarified the phrase "in a concrete and unambiguous manner." *Id.* at 1256.

¶ 57    Finally, we acknowledge that proximate cause is not specifically defined in the model criminal jury instructions and that the use of an excerpt from an opinion as a jury instruction is a risky practice. *See People v. Pahl*, 169 P.3d 169, 183-84 (Colo. App.

2006) ("As a general rule, the use of an excerpt from an opinion in a jury instruction is an unwise practice because opinions and instructions have very different purposes."). Nonetheless, the model instructions are not binding or authoritative. *Cox,* ¶ 20. And, as some of the comments to the model criminal jury instructions indicate, the term can be "confusing" to jurors. Indeed, the trial court here indicated that the word proximate "tends to be confusing to a jury." Given these dynamics, the model instructions' comment about potential juror confusion concerning "proximate cause" counseled in favor of providing the jury the requested definition so it could better understand that phrase as used in the instructions.[2]

¶ 58 For these reasons, we conclude that the trial court erred by failing to define proximate cause in response to the jury's question.

---

[2] COLJI-Crim. 3-1:12 cmt. 2 (2024) cites *People v. Stewart*, 55 P.3d 107, 116 (Colo. 2002), noting differences between "cause" and "proximate cause." But this distinction also seems to amplify the need to provide a definition of proximate cause when that term is used in the instructions provided to the jury. *Stewart*, 55 P.3d at 116 (""[C]ause" means that act or failure to act which in natural and probable sequence produced the claimed injury.' Proximate cause, by contrast, 'means a cause which in natural and probable sequence produced the claimed injury. It is a cause without which the claimed injury would not have been sustained.'") (citations omitted).

¶ 59 Nonetheless, we determine that the error was harmless because the evidence that Claycomb's careless driving was the proximate cause of the Melansons' deaths was overwhelming. *See People v. Grassi*, 192 P.3d 496, 499-500 (Colo. App. 2008) (ordinary harmless error review applies to a defendant's challenge to the trial court's proximate cause instruction for purposes of vehicular homicide). True, as Claycomb asserts, some of the evidence involved "precise details such as whether the experts made calculations using a 'drag factor' of 0.70 or 0.75 and whether one specific mark on the road was a 'skid' mark or a 'yaw scuff' mark." Regardless, all three experts testified that Claycomb was driving well over the posted sixty-five-mile-per-hour speed limit just before he collided with the Melansons. One expert testified that his pre-impact speed was 107 miles per hour; another testified that it was 105-117 miles per hour; and the third expert testified that it was 87-89 miles per hour. Therefore, according to the experts, Claycomb was driving at least twenty-two miles per hour, and up to fifty-two miles per hour, over the posted speed limit before the collision. And the jury ultimately found that Claycomb was driving at least twenty-five miles per hour over the speed limit.

¶ 60    Furthermore, the police officer who responded to the hospital where Claycomb was admitted after the collision testified that Claycomb confessed to colliding with the Melansons while driving eighty miles per hour.

¶ 61    It was also undisputed that Claycomb and the Melansons collided, which resulted in the Melansons' deaths.

¶ 62    Under any view of the evidence, it is apparent that Claycomb's conduct of excessive speeding, in natural and probable sequence, produced the Melansons' deaths, and without it, the deaths would not have occurred.

¶ 63    Accordingly, we conclude that the trial court's error in declining to give a definition for proximate cause was harmless.

F.    Jury Instructions Regarding Continued Deliberations

¶ 64    Finally, Claycomb contends that the trial court reversibly erred by instructing the jury regarding continued deliberations without first inquiring regarding the possibility of an impasse.  We disagree.

1.    Additional Facts

¶ 65    Approximately one and a half hours into deliberations, the jury asked the following two questions: "How long do we have to

deliberate until it is called a hung jury?" and "How many more days of deliberation would be maximum?"

¶ 66    The prosecutor argued that the trial court should tell the jury that "they have as long as they need."

¶ 67    Defense counsel moved for a mistrial, which the trial court denied.  Counsel then requested that the court give the jury a modified-*Allen* instruction and "make an inquiry of the jury."

¶ 68    The trial court responded,

> I think it's premature for that.  I think that,
> one, we don't know if they are hung on one
> charge, four charges, or something in between.
> Two, as I noted, this question came out at
> right around a little more or a little less than
> an hour and a half of deliberations, which is
> very little time.  I agree that the Court should
> advise the jury that the Court does not dictate
> how long a jury deliberates.

¶ 69    The court's response to the jury's questions said that "[t]he Court does not dictate how long a jury should deliberate.  You should continue to deliberate to see if you can reach a unanimous verdict on any, or all of the charges."  Neither the prosecutor nor defense counsel objected to this language.  The court also told counsel, "If later in the day they still are indicating that they have

not reached verdicts on one or more of the charges I may consider at that time if a modified[-]*Allen* instruction is appropriate."

¶ 70 Approximately four hours later, the jury asked for the definition of proximate cause.

¶ 71 When discussing the response to the proximate cause question, the court indicated that, because it was nearing 5 p.m., it would be giving a "getting close to 5 instruction," which gave the jury three options from which to select:

> (1) "We would like to break now and resume deliberations on Monday morning at 8:30 a.m. or 9:00 a.m.";
>
> (2) "Because we are close to reaching a verdict, we would like to continue deliberating today up to 5:30 p.m."; or
>
> (3) "We have reached a verdict."

Neither party objected to this instruction.

¶ 72 After the trial court went back on the record, defense counsel again moved for a mistrial and for the court to, at the very least, inquire of the jury as to its likelihood of progress toward a unanimous verdict.

¶ 73 The trial court responded,

Since that first question, at approximately an hour and a half into their deliberations, the jury has not given any indication that they've reached an impasse or that they are unable to reach a verdict. And until the jury does that, the Court will not give them the modified[-] *Allen* unless the Court believes that they have been extensively deliberating. The Court doesn't find, even at seven hours of deliberations on a case with two homicides and four charges, that this is an extraordinary amount of time to deliberate based upon the serious nature of the charges, the amount of evidence that was presented, the number of exhibits that were introduced as well. So I will deny the motion for the mistrial at this time.

¶ 74     After receiving the court's "getting close to 5 instruction," the jury asked a follow-up question: "Do we have to come back on Monday even if we make a decision by 5:30?" The trial court responded: "No. If you reach a verdict by 5:30 you will not have to come back on Monday."

¶ 75     Defense counsel objected due to "concerns that the response will pressure some jurors to reach a conclusion that may not be their own." The court advised defense counsel that counsel could have the jurors polled.

¶ 76    The jury answered the "getting close to 5 instruction" by indicating that it was close to a verdict and would like to continue deliberating until 5:30 p.m.

¶ 77    The jury returned its verdicts shortly before 5:30 p.m.

## 2.    Law and Analysis

¶ 78    A trial court may not give a jury instruction "that expressly or impliedly coerces the jury to reach a verdict regardless of whether that would require a juror to 'surrender his conscientious convictions to secure an agreement.'" *People v. Munsey*, 232 P.3d 113, 119 (Colo. App. 2009) (quoting *Lowe v. People*, 488 P.2d 559, 561 (Colo. 1971)).

¶ 79    If the jury communicates that it has reached an impasse, the trial court may give the jury a "modified-*Allen*" instruction, which "is a supplemental jury instruction designed to encourage, but not coerce, a deadlocked jury into reaching a unanimous verdict." *Fain v. People*, 2014 CO 69, ¶ 2.

> To accomplish this, the instruction informs the jury that it should attempt to reach a unanimous verdict; that each juror should decide the case for himself or herself; that the jurors should not hesitate to reconsider their views; and that they should not surrender

31

> their honest convictions solely because of
> others' opinions or to return a verdict.

*Id.*; *see also Allen v. People*, 660 P.2d 896 (Colo. 1983).

¶ 80     Before a trial court gives a modified-*Allen* instruction, the court should "determine whether there is a likelihood of progress towards a unanimous verdict upon further deliberations." *Fain*, ¶ 19 (quoting *People v. Schwartz*, 678 P.2d 1000, 1012 (Colo. 1984)). "The reason for this requirement is to minimize the potential that a modified-*Allen* instruction will coerce a hopelessly deadlocked jury into reaching a compromise verdict." *Id.*; *see also People v. Cox*, 2023 COA 1, ¶ 18 ("If there is no indication that the jury is deadlocked, . . . a premature modified-*Allen* instruction . . . may unnecessarily involve the court in jury deliberations that are progressing just fine on their own."). After making this determination, the trial court has discretion to decide whether to give the modified-*Allen* instruction. *Fain*, ¶ 19.

¶ 81     Under the circumstances of this case, we conclude that the trial court did not abuse its discretion by instructing the jury to continue deliberating in response to the questions submitted an hour and a half into deliberations. *See Cox*, ¶ 18 ("[T]he coercive

32

effect of a supplemental jury instruction (or a response to a jury question) is necessarily content- and context-dependent and must be assessed on a case-by-case basis.").

¶ 82    Claycomb relies primarily on *People v. Black*, 2020 COA 136, to support his contention that the trial court abused its discretion. In *Black*, during the second day of deliberations, a juror asked the trial court, "What happens if we can't come to a unanimous decision on only one charge?" *Black*, ¶ 8. Black requested that the court provide the jury with the modified-*Allen* instruction. *Id.* The trial court declined and instead, without inquiring of the jury concerning the nature and degree of its potential impasse, instructed the jury to "please continue with your deliberations at this time." *Id.* The jury returned a verdict thirty minutes later. *Id.*

¶ 83    On appeal, Black contended that the trial court erred by instructing the jury to continue deliberating without first inquiring into the nature and extent of the jury's impasse. *Id.* at ¶ 11. The division agreed, concluding the trial court erred "by instructing the jury to continue deliberating without first determining whether it was at an impasse and, if so, how intractable that impasse was." *Id.* at ¶ 12. The division noted that the trial court's failure to

inquire of the jury deprived the court of the ability to meaningfully assess the degree of the jury's deadlock and therefore reversal was required:

> [B]ecause the trial court failed to conduct this inquiry, it is impossible for us to now divine the nature of the jury's impasse from the cold record. The best we can do is say that, based on the jury's question, progress towards a verdict may have been unlikely or impossible (though the latter is less plausible). If either was true, the court's unqualified instruction to continue deliberating was coercive. We therefore conclude that the trial court abused its discretion by failing to conduct the threshold inquiry into whether progress towards a verdict was likely if deliberations continued.

*Id.* at ¶ 24.

¶ 84    The People rely primarily on *Cox* for their counterargument that the trial court acted within its discretion when it told the jury to keep deliberating. In *Cox,* four and a half hours into deliberations, the jury asked the trial court, "What happens if the jury fails to reach a unanimous decision?" and "Is there a max length for jury deliberations?" *Cox,* ¶ 11. The court, without inquiring concerning the nature and degree of a potential impasse, told the jury to continue deliberating and advised the jurors that

"[a] jury takes as long as it needs to reach a unanimous decision." *Id.* at ¶ 12. Two and a half hours later, the jury returned a verdict. *Id.* at ¶ 14.

¶ 85  On appeal, Cox contended that the trial court erred by instructing the jury to continue deliberating without first asking whether further deliberation was likely to result in a unanimous verdict. *Id.* at ¶ 15. The division disagreed. *Id.* at ¶ 36. In doing so, the division distinguished the case from *Black* and concluded that *Black* did not "establish[] an 'inflexible' per se rule that any time a jury asks a question about reaching unanimity — at any point in its deliberation — the district court must immediately, and without request, launch into the modified-*Allen* instructional framework." *Id.* at ¶ 29.

¶ 86  We conclude that Claycomb's case is more analogous to *Cox* and is distinguishable from *Black* for the same reasons expressed by the division in *Cox*. Indeed, we agree with the division in *Cox* that *Black* did not establish a hard-and-fast rule that, when a jury asks about reaching unanimity at any point during deliberations, the trial court must immediately proceed to the modified-*Allen* instructional framework. *Cox,* ¶ 29.

¶ 87    As in *Cox*, here the jury's questions "did not indicate that the jury was deadlocked," that "it was unable to reach a verdict," or that "further deliberations were unlikely to result in a verdict." *Cox*, ¶ 20; *see also Munsey*, 232 P.3d at 119-20 ("[T]he jury did not categorically state that it was unable to reach a verdict.  Nor was there any indication that further deliberations would not result in a verdict unless at least one juror voted in contravention of his or her true beliefs.").  Nor did the questions indicate that the jury might be deadlocked on a particular charge.  Rather, the jury was asking the trial court more generally about the time constraints for its deliberations.  These questions fell "well short of the explicit declarations of impasse that more typically trigger further inquiry or instruction." *Cox*, ¶ 20; *cf. People v. Dunlap*, 124 P.3d 780, 817-18 (Colo. App. 2004) (The jury told the trial court it was "at an impasse, with no movement from individuals' positions [occurring] over the past 2 hours," and asked the court, "[W]hat is the proper approach to try to resolve the [impasse]"; the division concluded that the court's response the next day to "resume your deliberations" was not improper.).

¶ 88     Second, as in *Cox,* the jury questions came after a short period of deliberation — only one and a half hours in a double homicide case. In *Cox,* the jury questions were posed after only four and a half hours of deliberation. *Cox,* ¶ 21. But in *Black,* the jury posed its question on the second day of deliberations. In contrast to *Black,* the jury here was early in its deliberations and was not "a hopelessly deadlocked jury [that had] been deliberating for days." *Black,* ¶ 17. "That made it less likely that the jury question reflected a true state of impasse . . . ." *Cox,* ¶ 21. And the short period of time also limited the coercive nature of the trial court's response. *Id.*; *see also Black,* ¶ 17 ("If it is early in deliberations and the jury is making progress towards a verdict, an instruction to continue deliberating, even an unqualified one, carries little coercive risk.").

¶ 89     Third, the trial court's response to continue deliberating did not contain any coercive content. It did not "place any deadline on deliberations" or explicitly or implicitly urge the jurors "to compromise their views for the sake of unanimity." *Cox,* ¶ 22.

¶ 90     Finally, as in in *Cox,* "there is no indication the jury was in fact coerced by the court's response." *Id.* at ¶ 35. When the jury

37

asked the questions, it had only been deliberating for one and a half hours. And after receiving the trial court's response, the jury deliberated for approximately another five hours before returning the verdict. This "cuts against a conclusion that the jury felt pressured by the court's response." *Id.* In contrast, the jury in *Black* returned a verdict only thirty minutes after being told to continue deliberating. *Black*, ¶ 8.

¶ 91     Because like in *Cox*, the trial court's instruction for the jury to continue deliberating did not implicitly coerce the jurors, we conclude that the trial court did not abuse its discretion by giving the instruction.

¶ 92     Claycomb also argues that the coercive impact of the trial court's instruction to continue deliberating was compounded by the court's "getting close to 5" instruction. Because we conclude that the court's instruction to continue deliberating did not coerce the jury, we likewise conclude that there was no coercion to be compounded. We do, however, encourage trial courts to exercise caution in giving instructions like the court's "getting close to 5 instruction." While acknowledging a court's desires to manage juries, its docket, and courtroom logistics, and to move a case

toward completion, we also note that such instructions run the risk of encouraging the jury to rush to reach a verdict to avoid returning the next day. This hazard is demonstrated by the jury's follow-up question asking if it would have to return on Monday if it reached a verdict by 5:30 p.m., its selection of that option, and its return of a verdict right before that time. Nonetheless, because neither this response nor the prior instructions were coercive, given the specific facts and circumstances of this case, and the jury's deliberations, we perceive no reversible error.

## III.  Disposition

¶ 93    The judgment of conviction is affirmed.

JUDGE WELLING and JUDGE KUHN concur.